ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
ROYE ZUR, State Bar No. 273875
  *rzur@elkinskalt.com*
LAUREN N. GANS, State Bar No. 247542
  *lgans@elkinskalt.com*
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400
Facsimile: 310.746.4499

Nicole A. Sullivan (pro hac vice)
sullivann@whiteandwilliams.com
Thomas E. Butler (pro hac vice)
butlert@whiteandwilliams.com
WHITE AND WILLIAMS LLP
810 Seventh Avenue, Suite 500
New York, New York 10019
(212) 631-4420

Attorneys for Creditor Multiple Energy
Technologies, LLC

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>HOLOGENIX, LLC,<br><br>Debtor and Debtor in Possession. | Case No. 2:20-bk-13849-BR<br><br>Chapter 11 (Subchapter V)<br><br>Adversary Case No. 2:22-ap-01098-BR |
| HOLOGENIX, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MULTIPLE ENERGY TECHNOLOGIES LLC,<br><br>Defendant. | **NOTICE OF UNPUBLISHED AUTHORITIES CITED IN MULTIPLE ENERGY TECHNOLOGIES, LLC'S RESPONSE TO DEBTOR'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT AFTER REMAND FROM THE DISTRICT COURT**<br><br>**Hearing:**<br>Date:    May 26, 2026<br>Time:    10:00 a.m.<br>Place:    Courtroom 1668<br>          255 E. Temple St.<br>          Los Angeles, CA 90012 |

8096940

In accordance with Local Bankruptcy Rule 9013-2(b)(4), creditor and defendant Multiple Energy Technologies, LLC hereby attaches copies of the following unpublished decisions cited in *Multiple Energy Technologies, LLC's Response to Debtor's Brief in Support of Summary Judgment After Remand from the District Court* filed on March 31, 2026 as Dkt. No. 105.

**UNPUBLISHED CASES**

1.    *Carson Harbor Vill., Ltd. v. Unocal Corp.*, No. 96-CV-3281-MMM, 2003 U.S. Dist. LEXIS 14438 (C.D. Cal. Aug. 8, 2003);

2.    *Diamond v. Empire Partners, Inc.* (*In re Empire Land, LLC*), No. 6:09-ap-01235-MH, 2016 Bankr. LEXIS 1088 (Bankr. C.D. Cal. 2016);

3.    *Schoenmann v. BCCI Constr. Co.*, No. NC-07-1128, 2007 Bankr. LEXIS 4931 (BAP 9th Cir. Nov. 7, 2007);

4.    *Shay v. Cty. of L.A.*, No. 2:15-CV-04607, 2019 U.S. Dist. LEXIS 162400 (C.D. Cal. Sep. 23, 2019); and

5.    *Willis v. City of Fresno*, No. 09-CV-01766-BAM, 2013 U.S. Dist. LEXIS 131433 (E.D. Cal. Sept. 13, 2013).

DATED:  March 31, 2026          WHITE AND WILLIAMS LLP

By: _____
NICOLE A. SULLIVAN (pro hac vice)
Attorneys for Creditor Multiple Energy Technologies, LLC

DATED:  March 31, 2026

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP

By: _____
ROYE ZUR
Attorneys for Creditor Multiple Energy Technologies, LLC

ELKINS KALT WEINTRAUB REUBEN GARTSIDE LLP
10345 W. Olympic Blvd.
Los Angeles, California 90064
Telephone: 310.746.4400 • Facsimile: 310.746.4499

8096940

1

 Caution
As of: March 31, 2026 8:14 PM Z

# *Carson Harbor Vill., Ltd. v. Unocal Corp.*

United States District Court for the Central District of California

August 8, 2003, Decided ; August 8, 2003, Filed; August 12, 2003, Entered

CASE NO. CV 96-3281 MMM (RCx)

**Reporter**
2003 U.S. Dist. LEXIS 14438 *

CARSON HARBOR VILLAGE, LTD., a limited partnership, dba CARSON HARBOR VILLAGE MOBILEHOME PARK, Plaintiff, vs. UNOCAL CORPORATION, a Delaware Corp.; CARSON HARBOR VILLAGE MOBILE HOME PARK, a California general partnership; RICHARD G. BRALEY; WALKER SMITH, JR.; COUNTY OF LOS ANGELES; CITY OF COMPTON; CITY OF CARSON, Defendants.

**Subsequent History:** Summary judgment granted by, Motion granted by, in part, Motion denied by, in part, Motion to strike granted by, in part *Carson Harbor Vill., Ltd. v. Unocal Corp., 2003 U.S. Dist. LEXIS 14482 (C.D. Cal., Aug. 8, 2003)*

**Prior History:** *Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 2001 U.S. App. LEXIS 22863 (9th Cir. Cal., 2001)*

**Disposition: [*1]** Defendant City of Carson's motion to exclude testimony denied. Defendants' objections to Preliminary Appraisal Report of Richard A. Neustein and declaration of expert Dr. G. Fred Lee sustained.

# Core Terms

reliability, stormwater, scientific, summary judgment, harbor, proffer, contamination, runoff, expert testimony, storm water, urban, wetland, methodology, special knowledge, partnership, deposit, plant, law of the case doctrine, summary judgment motion, expert opinion, expert witness, no evidence, flexible, drain, storm, site

# Case Summary

**Procedural Posture**
In a water contamination case that was remanded from the United States Court of Appeals for the Ninth Circuit, government defendants moved to strike plaintiff's expert; defendant city moved to exclude the testimony of an expert as unreliable; and the partnership defendants objected that a report attached to an affidavit was inadmissible hearsay.

**Overview**
Because the Ninth Circuit's opinion could not have been read as having left open whether there was lead contamination in earlier stormwater runoff, the law of the case doctrine prohibited further consideration on the issue. Even if the law of the case doctrine had not precluded plaintiff from raising the issue through the testimony of its expert, the expert would not have been allowed to testify because plaintiff failed to show good cause for the expert's belated designation. The delay was neither justified nor harmless. As for another expert's testimony, it was allowed even though the expert's conclusions were not supported by site-specific data; however, that was an issue that went to the weight of the evidence rather than its admissibility and could be properly addressed through cross-examination rather than exclusion. The court agreed that the contents of an appraisal report that was attached as an exhibit to an affidavit in opposition to summary judgment was inadmissible hearsay because the declarant could not authenticate the exhibit.

Nicole Sullivan

**Outcome**

The court struck plaintiff's expert's testimony as barred by the law of case and because the expert was belatedly designated. The court declined to exclude the testimony of another expert as unreliable. The court struck an appraisal report as hearsay.

## LexisNexis® Headnotes

Civil Procedure > ... > Discovery > Methods of Discovery > Expert Witness Discovery

Evidence > ... > Testimony > Expert Witnesses > General Overview

Civil Procedure > Discovery & Disclosure > Disclosure > General Overview

### *HN1*  Methods of Discovery, Expert Witness Discovery

*Fed. R. Civ. P. 26* requires that expert witnesses submit an expert report that includes a complete statement of the opinions they intend to express, the bases for those opinions, the data they have considered, the compensation they will be paid, and a description of their qualifications, including a list of publications and other cases in which they have testified during the preceding four years. *Fed. R. Civ. P. 26(a)(2)(B)*.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

Evidence > Rule Application & Interpretation

Civil Procedure > ... > Discovery > Methods of Discovery > Expert Witness Discovery

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

### *HN2*  Disclosure, Mandatory Disclosures

Excluding expert evidence as a sanction for failure to disclose expert witnesses in a timely fashion is automatic and mandatory unless the party can show the violation is either justified or harmless. *Fed. R. Civ. P. 37(c)(1)*.

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

### *HN3*  Discovery, Misconduct During Discovery

See *Fed. R. Civ. P. 37(c)(1)*.

Civil Procedure > Judgments > Preclusion of Judgments > Law of the Case

Environmental Law > ... > Enforcement > Discharge Permits > Storm Water Discharges

Civil Procedure > Judgments > Preclusion of Judgments > General Overview

**_HN4_ Preclusion of Judgments, Law of the Case**

The law of the case doctrine precludes a court from reexamining an issue previously decided by the same court, or a higher court, in the same case. The law of the case encompasses both a court's explicit holdings, and those matters that are decided by necessary implication. An appellate holding that there remains a disputed issue of fact will preclude a later finding on remand that there is no dispute for summary judgment purposes. Conversely, a finding that there was "no evidence" precludes a finding on remand that there is a factual dispute regarding an issue.

> Evidence > Admissibility > Expert Witnesses > Daubert Standard

> Evidence > Admissibility > Scientific Evidence > Standards for Admissibility

> Evidence > Types of Evidence > Testimony > General Overview

> Evidence > ... > Testimony > Expert Witnesses > General Overview

> Evidence > Admissibility > Expert Witnesses

> Evidence > Admissibility > Expert Witnesses > Helpfulness

**_HN5_ Expert Witnesses, Daubert Standard**

_Fed. R. Evid. 702_ governs the admission of expert testimony, and provides that persons with specialized knowledge may testify if their testimony will be helpful to the trier of fact in determining an issue of fact. According to the United States Supreme Court in Daubert, _Fed. R. Evid. 702_ imposes an obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.

> Evidence > Admissibility > Expert Witnesses > Helpfulness

> Evidence > ... > Testimony > Expert Witnesses > General Overview

**_HN6_ Expert Witnesses, Helpfulness**

In the case of scientific knowledge, a district judge faced with a proffer of expert scientific testimony must, at the outset, assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can be applied to the facts of the case at hand. To assist the court in performing this function, the following non-exclusive list of factors should ordinarily be considered in evaluating the validity of an expert's scientific reasoning: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community. The analysis is a flexible one, and that its overarching subject is the evidentiary relevance and reliability of the principles that underlie a proposed submission. The focus, it noted, must be solely on principles and methodology, not on the conclusions that they generate.

> Evidence > Admissibility > Expert Witnesses > Daubert Standard

> Evidence > Admissibility > Scientific Evidence > Standards for Admissibility

> Evidence > ... > Testimony > Expert Witnesses > General Overview

Evidence > Admissibility > Expert Witnesses > Helpfulness

### [HN7](#) Expert Witnesses, Daubert Standard

Daubert's requirement of reliability extends to all expert testimony, whether based on scientific, technical or other specialized knowledge. The factors set forth in Daubert are not a set of rigid criteria to be applied in every case, but rather matters that a court "may" consider to the extent they are relevant in evaluating the reliability of the testimony being proffered. Because of the flexible nature of the inquiry, a trial judge must have considerable leeway in deciding how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony. Ultimately, a district court must determine whether the particular expert has sufficient specialized knowledge to assist the trier of fact in deciding the particular issues in the case.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

Evidence > Admissibility > Scientific Evidence > Standards for Admissibility

Evidence > ... > Testimony > Expert Witnesses > General Overview

### [HN8](#) Expert Witnesses, Daubert Standard

According to the United States Court of Appeals for the Ninth Circuit, in deciding whether an expert's methodologies are reliable, it makes little sense to ask whether the technique employed can be (and has been) tested, or what its known or potential rate of error might be when the expert's opinion is based entirely on a derivative analysis of available literature and studies.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

Evidence > Types of Evidence > Documentary Evidence > Affidavits

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

### [HN9](#) Supporting Materials, Affidavits

Under *Fed. R. Civ. P. 56(e)*, affidavits supporting and opposing a motion for summary judgment shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters therein.

**Counsel:** For CARSON HARBOR VILLAGE LTD, a limited partnership dba Carson Harbor Village Mobilhome Park, plaintiff: Chris M Amantea, Michelle L Manzo, McDermott Will & Emery, Los Angeles, CA.

For CARSON HARBOR VILLAGE LTD, a limited partnership dba Carson Harbor Village Mobilhome Park, plaintiff: Frank Gooch, III, Richard H Close, Gilchrist & Rutter, Santa Monica, CA.

For UNOCAL CORPORATION, defendant: Kurt Weissmuller, John P Zaimes, Peter A Nyquist, Weston Benshoof Rochefort Rubalcava & MacCuish, Los Angeles, CA.

For CARSON HARBOR VILLAGE MOBILE HOME PARK, RICAHRD G BRALEY, WALKER SMITH, JR, defendants: Walter J Lipsman, Morris Polich & Purdy, Los Angeles, CA.

For LOS ANGELES COUNTY, defendant: Gary E Yardumian, Jack C Nick, Prindle Decker & Amaro, Long Beach, CA.

For COMPTON CITY OF, defendant: Martin N Refkin, Thomas C Sites, Gallagher & Gallagher, Los Angeles, CA.

For CARSON CITY OF, defendant: John J Harris, Lisa Marie Bond, Richards Watson & Gershon, Los Angeles, CA.

For UNOCAL CORPORATION, cross-claimant: Kurt Weissmuller, Weston Benshoof Rochefort Rubalcava **[*2]** & MacCuish, Los Angeles, CA.

For CARSON HARBOR VILLAGE MOBILE HOME PARK, RICAHRD G BRALEY, WALKER SMITH, JR, cross-claimants: Walter J Lipsman, Morris Polich & Purdy, Los Angeles, CA.

For COMPTON CITY OF, cross-claimant: Frank Gooch, III, Richard H Close, Gilchrist & Rutter, Santa Monica, CA.

For UNOCAL CORPORATION, cross-defendant: Kurt Weissmuller, Weston Benshoof Rochefort Rubalcava & MacCuish, Los Angeles, CA.

For LOS ANGELES COUNTY, cross-defendant: Gary E Yardumian, Jack C Nick, Prindle Decker & Amaro, Long Beach, CA.

For CARSON CITY OF, cross-defendant: John J Harris, Lisa Marie Bond, Patrick K Bobko, Evan J McGinley, Richards Watson & Gershon, Los Angeles, CA.

For CARSON HARBOR VILLAGE MOBILE HOME PARK, RICAHRD G BRALEY, WALKER SMITH, JR, cross-defendants: Walter J Lipsman, Morris Polich & Purdy, Los Angeles, CA.

For COMPTON CITY OF, counter-claimant: Martin N Refkin, Timothy V P Gallagher, Gallagher & Gallagher, Los Angeles, CA.

For LOS ANGELES COUNTY, counter-claimant: Gary E Yardumian, Jack C Nick, Prindle Decker & Amaro, Long Beach, CA.

For CARSON CITY OF, counter-claimant: John J Harris, Lisa Marie Bond, Patrick K Bobko, Evan **[*3]** J McGinley, Richards Watson & Gershon, Los Angeles, CA.

For CARSON HARBOR VILLAGE MOBILE HOME PARK, RICAHRD G BRALEY, WALKER SMITH, JR, counter-claimants: Walter J Lipsman, Morris Polich & Purdy, Los Angeles, CA.

For CARSON HARBOR VILLAGE LTD dba Carson Harbor Village Mobilhome Park, counter-defendant: Frank Gooch, III, Richard H Close, Gilchrist & Rutter, Santa Monica, CA.

For RICAHRD G BRALEY, WALKER SMITH, JR, CARSON HARBOR VILLAGE MOBILE HOME PARK, counter-defendants: Walter J Lipsman, Morris Polich & Purdy, Los Angeles, CA.

**Judges:** MARGARET M. MORROW, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MARGARET M. MORROW

# Opinion

ORDER REGARDING CERTAIN EVIDENTIARY OBJECTIONS

The parties have filed numerous evidentiary objections in connection with the motions for summary judgment that have been filed. Certain of these are addressed in the summary judgment order itself. This order addresses certain objections challenging the evidence proffered by certain of plaintiff's experts.

**A. Declaration Of Dr. G. Fred Lee**

Plaintiff has proffered the declaration of expert Dr. G. Fred Lee, who asserts, *inter alia,* that "at least a portion of the lead detected in the wetland soils and slag **[*4]** material likely was deposited there from storm water discharges that occurred prior to 1990." [1] Each of the Government Defendants has objected to this testimony, and moved to strike the entirety of Dr. Lee's declaration. They assert that Dr. Lee was not designated to offer expert testimony regarding storm water, and that his testimony controverts findings that are the "law of the case." Plaintiff responds that its failure to disclose Dr. Lee's opinions on matters related to stormwater runoff is substantially justified, and that his findings are not contrary to the law of the case.

Following the Ninth Circuit's remand, both Carson Harbor and the Partnership Defendants requested leave to designate additional expert witnesses. The court denied plaintiff's motion to designate an expert regarding the Government Defendant's **[*5]** compliance with the 1996 NPDES permit, finding that the proffered testimony would not be relevant to the issues that remained to be tried, and that the law of the case doctrine prevented plaintiff from attempting to prove that the Government Defendants had violated the NPDES permits. The court found good cause to permit both plaintiff and the Partnership Defendants to designate an expert to discuss whether environmental standards in 1983 would have required the Partnership Defendants to remediate the contamination found on the property in 1993.

The Partnership Defendants designated Diane K. Mims as their expert on this subject in November 2002. On January 10, 2003, Carson Harbor designated Dr. Lee, and disclosed a letter in which he responded to Ms. Mims' report. [2] Dr. Lee's deposition was scheduled to be taken on May 5, 2003. The City of Compton thereafter filed a motion for summary judgment, in which it argued, *inter alia,* that Carson Harbor had proffered no evidence that there was lead in the stormwater flowing onto the property prior to issuance of the first NPDES permit in 1990. Carson Harbor opposed Compton's motion on May 5, 2003. In support, it proffered Dr. Lee's declaration, **[*6]** which offered several opinions regarding the likelihood that lead existed in the stormwater flowing onto the property prior to 1990. Plaintiff notes that it gave defendants a copy of the declaration prior to Lee's deposition on May 5, 2003, and that defendants did not question him regarding its contents.

As defendants correctly note, the court did not authorize Carson Harbor to designate an additional expert on the presence of lead in the stormwater and when lead from such a source might have found its way onto the property. *HN1 Rule 26 of the Federal Rules of Civil Procedure* requires that expert witnesses submit an expert report that includes a complete statement of the opinions they intend to express, the bases for those opinions, the data they have considered, the compensation they will be paid, and a description of their qualifications, including a list of publications **[*7]** and other cases in which they have testified during the preceding four years. *FED.R.CIV.PROC. 26(a)(2)(B)*. Plaintiff's expert reports must be served eight weeks, and defendants' reports five weeks, prior to the close of discovery. CA CD L. R. 9.4.6. The discovery cut-off date in this case was June 30, 1997, and the court authorized limited additional expert designations to address issues raised by the Ninth Circuit's decision on October 11, 2002.

*HN2* Excluding expert evidence as a sanction for failure to disclose expert witnesses in a timely fashion is "'automatic and mandatory' unless the party can show the violation is 'either justified or harmless.'" *Miksis v. Howard, 106 F.3d 754, 760 (7th Cir. 1997)*. See *FED.R.CIV.PROC. 37(c)(1) HN3* ("A party that without substantial justification fails to disclose information required by *Rule 26(a)* … *shall* not, unless such failure is harmless, be permitted to use as evidence at a trial … any witness … not so disclosed" (emphasis added)).

Carson Harbor contends there is substantial justification to admit Lee's testimony regarding lead in the stormwater because the presence of lead in the stormwater prior to issuance of the **[*8]** 1990 NPDES permit did not become an issue until the district court and Ninth Circuit held that Carson Harbor had failed to show the Government Defendants violated the NPDES permits. Plaintiff contends that Compton's recent motion for summary judgment is

---

[1] Declaration of G. Fred Lee, Ph.D in Support of Plaintiff's Opposition to Compton's Motion for Summary Judgment ("Lee Decl."), P 11. See also Pl.'s Carson Issues, P 26; Pl.'s Compton Issues, P 8.

[2] Declaration of Jack C. Nick in Support of LA's Objections to Plaintiff's Evidence ("Nick Decl."), P 5, Ex. C ("Expert Designation of Dr. Lee").

the first that addressed this matter. This argument is unpersuasive, both because the law of the case doctrine prohibits further consideration of the issue, and because Carson Harbor has failed to show good cause for its extremely belated attempt to designate an expert on this subject.

The Ninth Circuit held that *California Civil Code § 3482* precluded state law nuisance claims based on acts done "under the express authority of a statute." Consequently, it concluded that Judge Wardlaw had properly entered summary judgment in favor of the Government Defendants on plaintiff's nuisance claims because "[the NPDES] permits authorized the discharge of storm water containing pollutants, and there is no evidence that there was any lead-contaminated storm water runoff to the property prior to 1994 or a violation of the permits." *Carson Harbor Vill., Ltd. v. Unocal Corp., 270 F.3d 863, 888*. As the court's statement indicates, Carson Harbor's **[*9]** nuisance claim might have survived, despite the existence of the NPDES permits, had there been evidence that stormwater contaminated the property prior to the time the first permit was issued. *HN4* The law of the case doctrine precludes a court from reexamining an issue previously decided by the same court, or a higher court, in the same case. *Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 833 (9th Cir. 1982)*. The law of the case encompasses both a court's explicit holdings, and those matters that are decided by necessary implication. *Eichman v. Fotomat Corp., 880 F.2d 149, 157 (9th Cir. 1989)*. An appellate holding that there remains a disputed issue of fact will preclude a later finding on remand that there is no dispute for summary judgment purposes. See, e.g., *Winter v. United States, 190 F. Supp.2d 1187, 1191 (D. Ariz. 2002)*. Conversely, in the present case, the Ninth Circuit's holding that there was "no evidence" that there was "any lead-contaminated storm water runoff to the property prior to 1994" precludes a finding on remand that there is a factual dispute regarding the existence of contamination as a result of storm water runoff **[*10]** prior to 1990.

Plaintiff argues that "if the Ninth Circuit intended for its statement to be preclusive of proffering additional evidence, it would have granted summary judgment in favor of the Government Defendants on the CERCLA claim, as there would have been no basis for CERCLA liability against the Government Defendants." To the contrary, in remanding the CERCLA claim, the Ninth Circuit specifically stated that it "declined to address in the first instance the Government Defendants' remaining CERCLA arguments, including their arguments that they are, nevertheless, entitled to summary judgment because … federally permitted releases are exempt from CERCLA coverage under *42 U.S.C. § 9607(a)(4)(B)*." *Carson Harbor Village, supra, 270 F.3d at 874*. The Ninth Circuit thus explicitly recognized that the Government Defendants might be entitled to summary judgment because any releases for which they were responsible were protected by the NPDES permits. The opinion simply cannot be read as having left open whether there was lead-contaminated stormwater runoff to the property prior to 1990.

Even if the law of the case doctrine did not specifically **[*11]** preclude Carson Harbor from raising a question of fact regarding the existence of lead contamination in the stormwater runoff prior to 1990, the court would find that Dr. Lee's declaration must be excluded. Other than noting that defendants did not argue there was a lack of evidence on the point until Compton filed its motion for summary judgment, plaintiff offers no explanation for its belated designation of Dr. Lee as an expert on this subject. It does not explain why it did not seek to develop evidence on this point during the initial pre-appeal discovery period, or why it failed to seek leave to designate an expert on the subject some months ago when the court agreed to consider additional expert requests.

If the "primary issue [that] remained to be resolved" following the Ninth Circuit's decision concerned pre-1990 releases of contaminated stormwater, Carson Harbor should have promptly raised the issue with the court and requested leave to designate an expert on the subject. If the testimony is allowed at this point, defendants will be substantially prejudiced, because they have not had the opportunity to depose Dr. Lee regarding his opinions, because they have not been able **[*12]** to obtain declarations from rebuttal experts, and because they would incur significant expense and suffer further prolonged proceedings if these motions were continued to permit discovery and the preparation of appropriate expert rebuttal at this point. For these reasons, the court finds that Carson Harbor's delay in designating Dr. Lee as an expert on the existence of lead contamination in the stormwater runoff prior to 1990 was neither justified nor harmless. It accordingly excludes the entirety of his declaration. See *Baker v. Indian Prairie Cmty. Unit, School Dist. No. 204, 1999 U.S. Dist. LEXIS 17221, No. 96 C 3927, 1999 WL 988799, * 2-3 (N.D. Ill. Oct. 27, 1999)* ("Defendants were entitled to assume that Wakeley's and Holland's reports were complete. Defendants are now unfairly prejudiced by the Bakers' reliance on new and untimely expert opinions in

response to summary judgment …. The Court will not allow [Plaintiffs] to ambush Defendants with new expert opinions after the expert disclosure deadline and after they filed for summary judgment"); *Penland v. BIC Corp., 796 F. Supp. 877, 881 (W.D.N.C. 1992)* (striking expert affidavits filed in opposition to summary judgment **[\*13]** because they "contained purported expert opinion not previously disclosed … as required by the Federal Rules of Civil Procedure"). [3]

## B. Declaration Of Dr. Richard Gersberg

The City of Carson argues that the court should exclude **[\*14]** the expert testimony of Dr. Richard Gersberg because it is not reliable as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*. **HN5** *Rule 702 of the Federal Rules of Evidence* governs the admission of expert testimony, and provides that persons with specialized knowledge may testify if their testimony will be helpful to the trier of fact in determining an issue of fact. In *Daubert,* the Supreme Court held that "*Federal Rule of Evidence 702* imposes an obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'" *Id. at 589*.

**HN6** In the case of scientific knowledge, the Court held that a district judge faced with a proffer of expert scientific testimony must, at the outset, assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can be applied to the facts of the case at hand. *Id. at 592-93*. To assist the court in performing this function, the Court identified a non-exclusive list of factors that should ordinarily be considered in evaluating the validity of an expert's scientific **[\*15]** reasoning: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community. *Daubert, supra, 509 U.S. at 593-94*. The Court emphasized that the analysis is a "flexible" one, and that its "overarching subject" is the "evidentiary relevance and reliability … of the principles that underlie a proposed submission." *Id. at 594-95*. "The focus," it noted, "must be solely on principles and methodology, not on the conclusions that they generate." *Id. at 595*.

In *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, the Supreme Court clarified that **HN7** *Daubert's* requirement of reliability extended to all expert testimony, whether based on scientific, technical or other specialized knowledge. *Id. at 148-49*. It further clarified that the factors set forth in *Daubert* are not a set of rigid criteria to be applied in every case, but rather matters that a court "may" consider to **[\*16]** the extent they are relevant in evaluating the reliability of the testimony being proffered. See *id. at 150* ("Our emphasis on the word 'may' thus reflects *Daubert's* description of the *Rule 702* inquiry as 'a flexible one.' … 'The factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony'"). Because of the flexible nature of the inquiry, "the trial judge must have considerable leeway in deciding … how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id. at 152*. Ultimately, the district court must determine "whether the particular expert has sufficient specialized knowledge to assist the [trier of fact] 'in deciding the particular issues in the case.'" *Id. at 156*.

Dr. Gersberg heads the Division of Occupational & Environmental Health at San Diego State University. He holds a masters degree in biology **[\*17]** from the University of Houston and a Ph.D. in Microbiology from the University of

---

[3] Carson Harbor contends that Dr. Lee offered his opinions concerning stormwater as the source of the lead on the property in response to the report of the Government Defendants' expert, Diane Mims. Both Mims and Lee were designated to offer opinions on whether an owner of property in 1983 would have been legally required to remediate the contamination at the site. While Mims made certain statements regarding the source of the lead at the property in offering her opinion on 1983 remediation requirements, she was not designated as an expert on the source of the contamination any more than was Dr. Lee, and her statements regarding the source of the lead were not necessary to her opinion. Accordingly, plaintiff cannot justify having Lee opine on source by pointing to Mims' report.

California at Davis. He has acted as a principal investigator and a co-investigator on a number of contracts and grants involving the monitoring of water quality and use of wastewater wetlands to protect other bodies of water. He has also co-authored several articles regarding the use of artificial wetlands to treat wastewater and remove heavy metals.

In forming his expert conclusions, Dr. Gersberg relied on a series of pre-existing studies concerning the interaction between urban stormwater and wetlands. Specifically, he cites a 1992 study conducted by the Environmental Protection Agency ("EPA"), which found that urban runoff and storm sewers were among the top three leading sources of continuing water quality impairment, and that the median urban site had concentrations of 165 parts per billion of lead. Gersberg also cites two recent studies regarding the amount of lead in Los Angeles stormwaters. These studies found (1) that median stormwater pollutant levels in the Santa Monica Bay watershed are higher than 90 percent of all data points in the EPA's nationwide study, and (2) the that the average **[\*18]** concentration of lead from runoff in residential and commercial sites within an area including the cities of Los Angeles, Santa Monica, Beverly Hills, Culver City and El Segundo were higher than reported values. Dr. Gersberg notes that studies by the National Highway Administration and the California Department of Transportation ("Caltrans") indicate that lead emitted from vehicles correlates with lead in urban highway storm runoff. Indeed, he notes that the RWQCB for the Los Angeles Region entered a cease and desist order against Caltrans in 1993 following a report that soil samples from drain inlets at the I-10, I-5 and I-405 freeways showed lead levels above California criteria for hazardous waste. Based on these studies, Gersberg concludes that lead is found in significant quantities in urban runoff in the Los Angeles County storm drain system.

Dr. Gersberg also cites a national EPA study and a stormwater treatment project conducted in Fremont, California, which revealed that wetlands and marshes receiving urban storm water retained 95% and 88% of lead that is deposited respectively. Relying on these studies, he concludes that much of the lead that presumably flowed onto Carson **[\*19]** Harbor's wetlands through the storm drains likely remained there.

Carson contends that Dr. Gersberg's opinions are not reliable because (1) the general studies he cites are not supported by independent studies of the Carson Harbor stormwater and (2) there has been no showing that the drainage areas that were the subject of the studies are similar to the areas that drain onto Carson Harbor's property. Carson does not challenge the methodology used in the studies, perhaps *HN8* because the Ninth Circuit has held that "it makes little sense to ask whether the technique employed 'can be (and has been) tested,' or what its 'known or potential rate of error' might be" when the expert's opinion is based entirely on a derivative analysis of available literature and studies. *Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317, n. 4 (9th Cir. 1995)*.

Gersberg concedes that he did not review contamination data for the Carson Harbor property before rendering his opinion, and that he cannot conclude with certainty that the lead on the site was deposited by stormwater rather than other sources. He asserts, however, that he did not need to conduct site-specific sampling to **[\*20]** conclude that there was lead in the Carson Harbor storm water "because every sample [he has] ever taken in the urban environments has [had] lead, and all of the documentation [in his report] showed that there was lead in the urban storm water in L.A. County." [4] While he offer no comparison of the similarities between the tested sites and plaintiff's property, one can nonetheless extrapolate from his report that Dr. Gersberg believes the similarities lie in the presence of an urban environment, the proximity of a freeway to the storm drain system, and the relative geographic proximity of Carson Harbor's property to the Los Angeles locations that were previously studied.

None of the parties has proffered any evidence suggesting that Carson Harbor's property is distinct in some manner from the properties or locales **[\*21]** that were the subject of the national and local studies Gersberg cites. Accordingly, the court concludes that Dr. Gersberg's opinion is sufficiently reliable to be admissible under *Daubert*. While Gersberg concedes that his conclusions are not supported by site-specific data, that is an issue that goes to the weight of the evidence rather than its admissibility, and that is properly addressed through cross-examination

---

[4] Declaration of Thomas W. Casparian in Support of Plaintiff's Opposition to Compton's Motion for Summary Judgment, Ex. 1 (Deposition of Richard M. Gersberg, Ph.D. ("Gersberg Depo.")) at 82:8-15.

rather than exclusion. See *Martin v. Shell Oil Co., 180 F. Supp.2d 313, 319 (D.Conn. 2002)* ("Shell argues that Shkuda did not test his explanation …. [However, t]he *Daubert* factors and scientific methodology require that an opinion be testable, not that it necessarily be tested. While the plaintiffs place themselves at risk of strong cross-examination, the underlying explanation is not flawed for failure to test an explanation, especially at a cost of $ 70,000-100,000"). Compare *Rogers v. Raymark Industries, Inc., 922 F.2d 1426, 1431-32 (9th Cir. 1991)* (excluding an expert's "eyeball" comparison of dust levels in different plants as unreliable because the plants [the expert] visited were not part of any epidemiological study **[*22]** introduced at trial and there was no evidence of similarity between those plants and the plants subject to epidemiological study. The only relevance of the proffer was to show that the dust levels at Kaiser exposed Rogers to a risk similar to that of workers in those asbestos factories for which there were epidemiological studies. To make this comparison, however, required a connection for which there was no foundation: that the plants Dutton visited had the same dust levels as plants in the studies"); *Textron, Inc. v. Barber-Colman Co., 903 F. Supp. 1558, 1568-69 (W.D.N.C. 1995)* (finding that an expert's use of general studies was unreliable when those studies pertained to different pollutants or were limited to specific circumstances that were not relevant to the case at hand). Accordingly, Carson's motion to exclude Dr. Gersberg's testimony is denied.

## C. Report of Richard Neustein

One of the exhibits attached to the Declaration of Thomas W. Casparian in Support of Plaintiff's Opposition to the Partnership Defendants' Motion for Summary Judgment is the May 5, 1997, Preliminary Appraisal Report of Richard A. Neustein. [5] In his report, Neustein stated that **[*23]** the contamination in the property's wetlands was "mostly remediated." He indicated, however, that the property might "have additional contamination elsewhere, and [that it] continued to receive new contamination, notably lead, from upstream sources." [6] Neustein also stated that "the contaminant of most concern is lead, which is in the water flowing onto the property from upstream sources," as the "tar-like and slag-like substances" on the wetlands had been removed from all parts of the site "except … the most ecologically sensitive part." [7]

The Partnership Defendants object that Casparian cannot authenticate Neustein's report, and that the contents of the report are inadmissible hearsay. Defendants are correct. See *FED.R.CIV.PROC. 56(e)* (**HN9** affidavits supporting **[*24]** and opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters therein"). See *Anderson v. Quality Stores, Inc., 181 F.3d 86, 1999 WL 387827, * 3 (4th Cir. June 14, 1999)* (Unpub. Disp.) ("Defendants are correct that the initial materials submitted by Anderson - the reports and cover letter of the experts unaccompanied by affidavits attesting to their authenticity - did not comply with the requirements of *Federal Rule of Civil Procedure 56(e)* and therefore could not properly be considered in opposition to summary judgment"); *Wittmer v. Peters, 87 F.3d 916, 917 (7th Cir. 1996)* (unsworn expert reports were not admissible under *Rule 56(e)* to support or oppose summary judgment); *Fowle v. C & C Cola, 868 F.2d 59, 67 (3d Cir. 1989)* (expert's report attached to the declaration of plaintiff's counsel did not comply with *Rule 56(e)*, since "the substance of the report was not sworn to by the alleged expert"). Because neither a declaration nor the deposition testimony of Neustein has **[*25]** been submitted stating that the conclusions in the report are true and correct, defendants' objection is sustained.

DATED: August 8, 2003

MARGARET M. MORROW

---

[5] Declaration of Thomas W. Casparian in Support of Plaintiff's Opposition to the Partnership Defendants' Motion for Summary Judgment, Ex. 3.

[6] Neustein Preliminary Appraisal Report at 1.

[7] Neustein Preliminary Appraisal Report at 2-3.

2003 U.S. Dist. LEXIS 14438, *25

UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Positive

As of: March 31, 2026 8:15 PM Z

## *Diamond v. Empire Partners, Inc. (In re Empire Land, LLC)*

United States Bankruptcy Court for the Central District of California, Riverside Division

April 4, 2016, Decided; April 4, 2016, Filed & Entered

Case No.: 6:08-bk-14592-MH, Chapter: 7, Adv. No.: 6:09-ap-01235-MH

**Reporter**
2016 Bankr. LEXIS 1088 *

In re: EMPIRE LAND, LLC, Debtor(s),RICHARD K. DIAMOND, Chapter 7 Trustee, Plaintiff, v. EMPIRE PARTNERS, INC., a California Corporation, Defendant

**Subsequent History:** Motion denied by *Diamond v. Empire Partners, Inc. (In re Empire Land, LLC), 2017 U.S. Dist. LEXIS 207665 (C.D. Cal., Dec. 18, 2017)*

## Core Terms

consolidate, entity, bank account, disputed fact, transferee, summary judgment, sufficient evidence, equivalent value, partner, legal title, deposit, provide evidence, tax return, liquidity, defraud, genuine, series of transactions, light most favorable, fraudulent transfer, fraudulent intent, loan agreement, take place, credibility, non-moving, withdrawal, covenant, guaranty, hinder, badge, repay

**Counsel:** **[*1]** For Empire Land, LLC, Debtor (6:08-bk-14592-MJ): Richard K Diamond (TR), Danning, Gill, Diamond & Kollitz, Los Angeles, CA; Michael I Gottfried, O'melveny & Myers, Los Angeles, CA; Jonathan A Loeb, Jeffrey Rosenfeld, Blank Rome LLP, Los Angeles, CA; Robert M Saunders, James Stang, Dean A Ziehl, Pachulski Stang Ziehl & Jones LLP, Los Angeles, CA; P Sabin Willett, Bingham McCutchen, Boston, MA.

For Richard K Diamond (TR), Trustee (6:08-bk-14592-MJ): Richard S Berger, Peter J Gurfein, Monica Rieder, Aleksandra Zimonjic, Roye Zur, Landau Gottfried & Berger LLP, Los Angeles, CA; Peter M Bransten, Oakland, CA; Richard K Diamond Danning, Gill, Diamond & Kollitz, Los Angeles, CA; Amy Evans, Cross & Simon LLC, Wilmington, DE; Michael I Gottfried, Los Angeles, CA; Paul Hastings; Rodger M Landau, Landau & Berger LLP, Los Angeles, CA; Lisa N Nobles, Kutner Miller Brinen PC, Denver, CO.

For United States Trustee (RS), U.S. Trustee (6:08-bk-14592-MJ): Michael J Bujold, US Department of Justice, Riverside, CA; Timothy J Farris, Riverside, CA; Abram Feuerstein, esq, Stockton, CA; Everett L Green, Office of the US Trustee, Riverside, CA; Kelly L Morrison, Office of the US Trustee, Los Angeles, CA.

Prescott **[*2]** Resort Hotel, Interim Trustee (6:08-bk-14592-MJ), Pro se.

For Official Committee of Unsecured Creditors, Creditor Committee (6:08-bk-14592-MJ): Michael I Gottfried, Los Angeles, CA.

For RICHARD K. DIAMOND, RICHARD K. DIAMOND, Chapter 7 Trustee, Plaintiff (6:09-ap-01235-MH): Richard S Berger, LEAD ATTORNEY, John P Reitman, Monica Rieder, Aleksandra Zimonjic, Roye Zur, Landau Gottfried & Berger LLP, Los Angeles, CA; Peter M Bransten, Oakland, CA; Michael I Gottfried, LEAD ATTORNEY, Cynthia M Cohen, Los Angeles, CA.

For Empire Partners, Inc., a California Corporation, EMPIRE PARTNERS, INC., a California Corporation, Defendant (6:09-ap-01235-MH): Jonathan A Loeb, Jeffrey Rosenfeld, Blank Rome LLP, Los Angeles, CA; David Loughnot, Los Angeles, CA.

DOES 1 through 100, inclusive, DOES 1 through 100, inclusive, Defendant (6:09-ap-01235-MH), Pro se.

**Judges:** Mark Houle, United States Bankruptcy Judge.

Nicole Sullivan

**Opinion by:** Mark Houle

# Opinion

**MEMORANDUM DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is a motion by Empire Partners, Inc. ("Defendant") for Summary Judgment against chapter 7 trustee, Richard K. Diamond ("Plaintiff").

## I. PROCEDURAL BACKGROUND

On April 25, 2008, Empire Land, LLC ("Empire Land"), Aviat Homes, **[*3]** L.P. ("Aviat"), Empire Construction, L.P. ("Empire Construction"), Empire Global Holdings, L.P. ("Empire Global"), Empire Residential Construction, L.P. ("ERC"), Empire Residential Sales, L.P. ("ERS"), Prestige Homes, L.P. ("Prestige"), and Wheeler Land, L.P. ("Wheeler") (collectively "Debtors"), filed voluntary chapter 11 petitions for relief. An order approving joint administration of Debtors' cases was entered on May 5, 2008, which designated Case No. 6:08-bk-14592-MJ (Empire Land) as the lead case. On December 8, 2008, Debtors' cases were converted from chapter 11 to chapter 7 and Richard K. Diamond was appointed as the chapter 7 trustee ("Trustee" or "Plaintiff"). An order approving substantive consolidation of Debtors' cases was entered on September 16, 2009 ("Consolidation Order").

On May 12, 2009, Trustee filed a complaint ("Complaint") against Empire Partners, Inc. ("EPI" or "Defendant"), Adv. No. 6:09-ap-01235-MH. Plaintiff's original complaint alleged four fraudulent transfers under federal and state law in the amounts of (1) $9,667,000 ("$9.6 M transfer"), (2) $4,000,000 ("$4 M transfer"), (3) $2,500,000 ("$2.5 M transfer"), and (4) $1,415,032.14 ("$1.4 M transfer"), in **[*4]** addition to various other claims under state law. On April 26, 2010, Plaintiff filed a First Amended Complaint.

On July 30, 2014, Defendant filed the instant Motion for Summary Judgment ("Motion") and on August 21, 2014, Trustee filed his opposition to the Motion ("Opposition").[1]

On March 3, 2015, Trustee filed a Motion for Leave to Amend to File a Second Amended Complaint Withdrawing Certain Claims for Relief ("Motion for Leave"). On December 1, 2015, the Court entered an order granting the

---

[1] The summary judgment record consists of the following: the Motion; Proposed Statement of Uncontroverted Facts ("PSUF"); Declaration of Jeffrey Rosenfeld in Support of Motion ("Rosenfeld Dec."); Declaration of James P. Previti in Support of the Motion ("Previti Dec."); Declaration of Neil Miller in Support of the Motion ("Miller Dec."); Declaration of Larry Day in Support of the Motion ("Day Dec."); Request for Judicial Notice ("Defendant's RJN"); Opposition; opposition to PSUF Statement of Genuine Issues ("SGI"); Evidentiary Objections to the Day Dec., Miller Dec, Previti Dec., and Rosenfeld Dec.; Request for Judicial Notice ("Trustee's RJN"); Declaration of Peter M. Bransten in Support of the Opposition ("Bransten Dec."); Declaration re: Corrected Docket No. 230 (Exhibit J through O to the Declaration of the Bransten Dec; Notice of Filing Exhibits to Expert Witness Reports; reply to Trustee's Opposition ("Reply"), **[*5]** Reply to Trustee's SGI, Replies to Trustee's Evidentiary Objections, Declaration of John Loeb in Support of the Reply ("Loeb Dec."); and Evidentiary Objections to the Bransten Dec., Trustee's RJN, and Notice of Filing Exhibits to Expert Witness Reports; Trustee's Response to Defendant's Evidentiary Objections to the Bransten Dec., Declaration of Cynthia M. Cohen in Response to Defendant's Evidentiary Objections to the Bransten Dec., Declaration of Peter M. Bransten in Response to Defendant's Evidentiary Objections to the Bransten Dec., Declaration of William Haegele in Response to Defendant's Evidentiary Objections to the Expert Reports and Exhibits thereto; Declaration of Timothy P. Sullivan in Response to Defendant's Evidentiary Objections to the Expert Reports and Exhibits thereto; Trustee's Response to Defendant's Evidentiary Objections to Trustee's RJN; Trustee's Response to Defendant's Evidentiary Objections to Notice of Filing Exhibits and Defendant's Objections to Plaintiff's Improper Filing of Documents; Errata to the Declaration of Peter Bransten; a Corrected Declaration of Peter Bransten in Response to Defendant's Evidentiary Objections; reply to Trustee's Response to Evidentiary **[*6]** Objections; Errata to the Declarations of William Haegele and Timothy P. Sullivan; a Corrected Declaration of William Haegele; and Corrected Declaration of Timothy P. Sullivan.

Motion for Leave, allowing Trustee leave to file the Second Amended Complaint. On February 23, 2016, Plaintiff filed a Second Amended Complaint.

The hearing on the Motion was originally set for September 10, 2014, and was continued several times. At a continued hearing on March 24, 2015, the Court took the Motion under submission. A hearing on the Motion was ultimately reset for February 18, 2016, to coincide with the hearing on Defendant's motion for summary judgment in Adv. No. 6:10-ap-01329-MH, at which time the Court had indicated it intended to announce its ruling on the instant Motion.

Having considered the Motion, Opposition, the summary judgment record, the argument of counsel at all of the hearings on the Motion, and for the reasons set forth below the Court will DENY Defendant's Motion in **[*7]** its entirety.

## II. EVIDENTIARY OBJECTIONS

1. As stated at the hearing on November 19, 2014, the Court will: (1) overrule Defendant's Evidentiary Objections to the Notice of Filing Exhibits to Expert Witness Reports; (2) sustain Plaintiff's Evidentiary Objections to the Declaration of James Previti; (3) sustain Plaintiff's Evidentiary Objections to the Declaration of Jeffrey Rosenfeld; (4) sustain Plaintiff's Evidentiary Objections to the Declaration of Larry Day, except to overrule Plaintiff's objection to paragraph 2, lines 6-7 of the Declaration of Larry Day; and (5) overrule Plaintiff's Evidentiary Objections to the Declaration of Neil Miller, except to sustain Plaintiff's objection to paragraph 3, Exhibit A of the Declaration of Neil Miller.

2. As stated at the hearing on January 28, 2015, the Court will: (1) overrule Defendant's Evidentiary Objections to the Declaration of Peter Bransten, except to sustain Defendant's objection to Exhibit W of the Declaration of Peter Bransten; and (2) overrule Defendant's Evidentiary Objections to Plaintiff's Request for Judicial Notice.

## III. FACTUAL BACKGROUND[2]

Defendant is a California corporation with its principal **[*8]** place of business in California, and served as either the general partner or managing member for Empire Global, Aviat, Empire Construction and Empire Land. From the time of formation of each of the entities, James Previti ("Previti") served as a director of Defendant and directly or indirectly controlled all of the legal and equitable interests of each of Empire Global, Empire Land, Aviat, Wheeler Land, ERC, ERS, Prestige, and Empire Construction, until the appointment of Plaintiff as chapter 7 trustee.

Debtors

Empire Global was a holding company that had a 99% ownership interest in each of Empire Land and Aviat at all times at issue in the Second Amended Complaint. Aviat was a holding company that had a 99% ownership interest in Prestige and ERC at all times at issue in the Second Amended Complaint. ERC was in the homebuilding business in Arizona. As of March 31, 2008, ERC owned approximately 1,023 residential lots in six different Arizona communities. ERS marketed and sold homes in ERC in Arizona, taking title to them immediately before the sale for Arizona sales tax purposes. Prestige was in the homebuilding business in California.

Anaverde, LLC

Anaverde, a Delaware limited liability **[*9]** company, owned: (i) a master planned, partially entitled residential development in Palmdale, California, comprising of almost 2,000 acres, which includes approximately 5,000 lots;

---

[2] The following facts are also undisputed.

and (ii) an adjacent development commonly known as Chandar planned for 157 single family homesites (collectively, the "Project").

The IndyMac Loan

On or about August 28, 2006, Anaverde entered into a loan agreement with IndyMac Bank F.S.B. here by Anaverde borrowed $89,000,000 and, in connection therewith, Previti and the James Previti Family Trust ("Family Trust") made a limited guaranty. Additionally, on behalf of Empire Land, Defendant made a payment and completion guaranty, and Empire Land represented that it would maintain a minimum liquidity equal to or greater than $10,000,000.

On May 31, 2007, Anaverde and IndyMac entered into an agreement to extend the term of the IndyMac Loan Agreement to August 27, 2009 (the "*First Amendment* to IndyMac Loan Agreement"). In connection with the *First Amendment* to IndyMac Loan Agreement, Defendant on behalf of Empire Land, Mr. Previti, and the Family Trust, entered into a Consent and Agreement of Guarantor (the "Amended IndyMac Guaranty"). Also in connection with the *First Amendment* to the IndyMac Loan Agreement, **[*10]** Mr. Previti and the Family Trust entered into an Amended and Restated Guaranty (the "Amended Previti IndyMac Guaranty").

## IV. TRANSFERS

A brief description of each of the remaining transfers in the Second Amended Complaint is set forth below:

1. On June 18, 2007, Empire Land transferred $9.6 M to Defendant. Defendant alleges that the transfer to Defendant was part of a series of transactions where Empire Land was repaying an inter-company loan to Prestige. Defendant describes the series of transactions as "short term inter-company loans." Defendant alleges that: (1) Prestige transferred $9.6 M to Empire Land through a series of seven transactions (i) $3,500,000 on May 4, 2007, (ii) $767,000 on May 7, 2007, (iii) $2,000,000 on May 8, 2007, (iv) $750,000 on May 22, 2007, (v) $600,000 on May 23, 2007, (vi) $1,600,000 on May 30, 2007, and (vii) $450,000 on May 31, 2007; (2) with the exception of the $3,500,000, Prestige deposited the monies into Aviat's bank account, which immediately deposited them into Defendant's bank account, which immediately deposited them into Empire Land's bank account; (3) the $3,500,000 was deposited by Prestige directly into Empire Land's bank account; (4) on or **[*11]** around June 18, 2007, Empire Land transferred $9.6 M to Defendant's bank account, which immediately transferred the funds to Aviat's bank account, and finally to Prestige's bank account; and (5) Plaintiff has isolated the one transfer from Empire Land to Defendant (essentially arguing that Defendant was a mere conduit). Plaintiff alleges that the $9.6 M transfer was not a short term loan, but a capital distribution to Defendant.

2. In June 2007, Plaintiff alleges that Empire Land transferred $4 M to Defendant as a capital contribution. Defendant alleges that no transfer actually took place but a series of journal entries were made and reversed.

3. On April 16, 2007, Empire Global transferred its interest in a promissory note of approximately $1.4 M to Defendant. Defendant alleges the transfer was part of a process to convert a loan from Previti to Empire Land into a capital contribution. Previously, on December 28, 2006, Previti loaned Empire Land $1,500,000 pursuant to the terms of a written Unsecured Promissory Note ("Note"). On January 4, 2007, Empire Land transferred $131,705 to Previti as partial repayment of the amount due under the Note. Defendant alleges that as of April 30, **[*12]** 2007, the balance owed on the Note was $1,415,032.14. Defendant also alleges that in a non-cash transaction, the $1,415,032.14 owed by Empire Land to Mr. Previti, pursuant to the Note, was converted into a capital contribution such that Empire Land was no longer required to repay the Note. Defendant further alleges that the contribution occurred in four sequential steps such that the Note was transferred from Previti, to the Family Trust, to Empire Global, to Defendant, and then to Empire Land. Last, Defendant alleges that the intent and effect of the transfers of the Note was to relieve Empire Land of the obligation of repaying the Note to Previti; a benefit that Empire Land did receive. Plaintiff argues that Empire Global's books and records reflect a

distribution of approximately $1.4 M from Empire Global to Defendant. Plaintiff alleges that the transfers were part of a scheme so it would appear that Empire Land could meet the $10,000,000 liquidity covenant.

# V. DISCUSSION

## Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding pursuant to *28 U.S.C. §§ 157* and *1334* because those claims arise under title 11 of the United States Code ("Bankruptcy Code") and/or are related to **[*13]** a case pending under title 11.

## Summary Judgment

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *Id. at 324*. The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co., 669 F.2d 1278, 1284 (9th Cir. 1982)*. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976)*. The inference drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989)*. Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Insurance Co. of N. Am., 638 F.2d 136, 140 (9th Cir. 1981)*.

If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in *Rule 56*, specific facts showing that there is a genuine issue for trial. *Id.* However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact..." *Matsushita Electrical Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A dispute about a material fact is genuine "if **[*14]** the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "'[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Anderson, 477 U.S. at 249* (quoting *First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968))*.

There is no requirement that the trial judge makes findings of fact, but performs a threshold inquiry of determining whether there is a need for trial. *Id. at 250*. "Because credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, on a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Id. at 255*; *Heller Ehrman LLP v. Jones Day (In re Heller Ehrman LLP), 2013 Bankr. LEXIS 889, 22-23 (Bankr. N.D. Cal. Mar. 11, 2013)*. On a motion for summary judgment the court's purpose is issue-finding, not issue-resolution. *United States v. One Tintoretto Painting, 691 F.2d 603, 606 (2nd Cir. 1982)*. If the basic facts are undisputed, but reasonable minds could differ on the inferences to be drawn from those facts, summary judgment should be denied. *Lake Nacimiento Ranch Co. v. San Luis Obispo County, 841 F.2d 872, 875 (9th Cir. 1987)*. *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. Trial courts may deny summary judgment where there is reason to believe that the better course would be to proceed to a full trial. *Anderson, 477 U.S. at 255*.

A. Initial Transferee

Defendant alleges that Plaintiff **[*15]** cannot establish that Defendant was an initial transferee with respect to all three transfers, and therefore, Plaintiff cannot recover on his federal fraudulent transfer claims under *§ 548* (claims 1, 3, 5, 7, 14, 16, 18, 20, 41, 43, 45, and 47), and on his state law fraudulent transfer claims under *§ 3439.04* (claims 2, 4, 6, 8, 15, 17, 19, 21, 42, 44, 46, and 48).

The Ninth Circuit uses the dominion test to determine whether a party is an initial transferee or a mere conduit. *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.), 463 F.3d 1064, 1069 (9th Cir. 2006)*; *In re Bullion Reserve of North America, 922 F.2d 544, 549 (9th Cir. 1991)*; *Walsh v. Townsquare Assocs. (In re Montross), 209 B.R. 943, 948 (9th Cir. B.A.P. 1997)*; *Schoenmann v. BCCI Constr. Co. (In re NorthPoint Communs. Group, Inc.), 2007 Bankr. LEXIS 4931, 10 (9th Cir. B.A.P. Nov. 7, 2007)*.

"The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit." *Incomnet, 463 F.3d at 1071*; *NorthPoint, 2007 Bankr. LEXIS 4931, 12 n.9*. The dominion test defines a transferee as one who has "dominion over the money or other asset, the right to put the money to one's own purposes." *Incomnet, 463 F.3d at 1070*; *NorthPoint, 2007 Bankr. LEXIS 4931, 11*. "The focus on 'dominion' is useful for those unusual situations in which legal title to funds and the right to put those funds to use have been separated. There are two primary cases when this may occur: (1) when an entity has legal title as a formal matter, but legally does not have any discretion in the application of funds; and (2) when an entity does not possess legal title, but nevertheless has sufficient authority over the funds to direct **[*16]** their disbursement." *Incomnet, 463 F.3d at 1073-74*. An entity without dominion or control is deemed a "conduit" which is merely a facilitator without sufficient control over the funds passing through its hands to be considered a transferee. *Montross, 209 B.R. at 948*.

In determining whether an entity has dominion over the funds courts have focused on whether the entity has a legal obligation with respect to the funds and whether it received the funds without any restrictions. *See Incomnet, 463 F.3d at 1075*; *NorthPoint, 2007 Bankr. LEXIS at 13-14*. Courts have also examined whether the entity is aware of the funds. *See In re Reeves, 65 F.3d 670, 676 (8th Cir. 1995)* (corporation did not have dominion over funds where corporation was unaware of transfer); *Montross, 209 B.R. at 949* (court found that Townsquare was not a transferee where funds were being laundered by one partner, and the funds were never used by Townsquare and none of the other partners where aware of the existence of the funds).

Other circuits, outside the Ninth Circuit have adopted the more lenient "control" test, where the entire transaction is viewed as a whole to determine who truly had control of the money. *Incomnet, 463 F.3d at 1070*. In *Chase & Sanborn Corp.*, the Eleventh Circuit stated that under the control test, courts must step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and **[*17]** equitable. *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1197-98 (11th Cir. 1988)*. In comparing the two tests, "[t]he dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit," whereas "[t]he control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question." *Incomnet, 463 F.3d at 1071* (internal citations omitted).

Here, with respect to the $9.6 M and $1.4 M transfers,[3] Plaintiff has presented evidence that Empire Land and Empire Global transferred funds to Defendant [*See* Bransten Dec. Exhibits F, R, and DD]. Exhibit F includes Empire Land's bank account statement, which reflects a withdrawal of $9.6 M and Defendant's bank account statement, which reflects a cumulative deposit of $9.6 M. Exhibit R is Empire Land's tax return, which reflects a distribution of $13,667,789, which Plaintiff alleges includes the $9.6 M transfer. Exhibit DD is an Empire Global's tax return, which reflects a distribution in the amount of $1.4 M.

While the parties dispute the characterization of the transfer (short term **[*18]** loan v. distribution), neither party has provided evidence whether Defendant had a legal, contractual, or any other obligation to use the funds, or otherwise received the funds with any restrictions. Additionally, the Court notes that the evidence indicates that Defendant may have been the entity behind the transfers (as the managing partner or member of Empire Land and

---

[3] Defendant does not dispute the identity of the transferee with respect to the $4 M transfer because it alleges that no transfer actually took place. *See* Motion, page 13, n.3.

Empire Global) and as such, the inference can be drawn that it had the ability to use the funds as it saw fit (whether it was holding legal title to the funds, or causing the funds to be transferred between the Debtors). Thus, drawing all inferences in a light most favorable to the opposing party, the Court finds a material issue of fact exists as to whether Defendant could use the funds as it saw fit, and thus, under the dominion test, whether it was a transferee of the funds.

Substantive Consolidation

Defendant alleges with respect to the $9.6 M and $4 M transfers that no transfer actually occurred. With respect to the $4 M transfer, Defendant argues that there is nothing that would constitute a transfer because no money was actually moved and there was nothing of value that was transferred.

Section 101(54)(D) defines transfer as each **[*19]** mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-- (i) property; or (ii) an interest in property. 11 U.S.C. § 101(54)(D). The term transfer under Section 101(54) is to be broadly construed. Morrissy v. Dereve (In re Dereve), 381 B.R. 309, 326 (Bankr. N.D. Fla. 2007). Transfer under § 101(54) includes a withdrawal from a bank account. In re Bernard, 96 F.3d 1279 (9th Cir. 1996) (debtor's withdrawal of cash from a bank account constituted a transfer because the debtor parted with a claim against the bank in exchange for the cash); Haag v. Northwestern Bank (In re Haag), 584 Fed. Appx. 620, 2014 U.S. App. LEXIS 16030 (9th Cir. Aug. 20, 2014). "Within the context of a fraudulent transfer, the definition of transfer is sufficiently broad to include a transfer that results in a **modification of form** or value of property transferred or a deposit into or withdrawal from a bank account." *Towers v. United States, Dep't of Treasury, IRS (In re Feiler)*(**emphasis added**), 218 B.R. 957, 960 (Bankr. N.D. Cal. 1998). *See* Bernard, 96 F.3d at 1283; In re Richmond Produce Co., Inc., 151 B.R. 1012, 1021 (Bankr. N.D. Cal. 1993); 2-101 Collier on Bankruptcy P 101.54 (16th ed. 2015). "Money deposited in a debtor's bank account, over which the debtor exercises control, is property of the debtor. By contrast, property held in trust for another does not become property of the estate. The burden of establishing a trust relationship lies with the claimant when property of the estate is alleged to be held in trust." Easyriders, Inc. v. Bayview Commer. Leasing (In re Easyriders, Inc.), 2006 Bankr. LEXIS 2445, 18 (Bankr. C.D. Cal. May 18, 2006) (internal citations omitted).

Here, there is evidence that the $4 M transfer was **[*20]** recorded as a distribution from Empire Land to Defendant [*See* Bransten Exhibit R]. Exhibit R is Empire Land's tax return, which reflects a distribution in the amount of $13,667,789, which Plaintiff alleges includes the $4 M transfer. However, there is also evidence that the $4 M transfer was only a re-characterization of a journal entry.[4] As all inferences must be drawn in a light most favorable to the non-moving party, the Court finds Plaintiff has identified sufficient evidence to create a disputed fact whether the $4 M transfer occurred. Additionally, the Court finds Plaintiff's evidence sufficient to establish a disputed fact as to whether Defendant was a transferee with respect to the $4 M transfer, and whether it had dominion over the funds. *See supra* Section A.

With respect to the $9.6 M transfer, Defendant argues that it was not a transfer because Defendant was only a conduit and the funds transferred were not diverted from being available to pay the Debtors' other creditors, as every dime that Defendant received **[*21]** ultimately went back to Debtors. Defendant's argument relies on the Consolidation Order, substantively consolidating the Debtors' estates. Because the Debtors were substantively consolidated, Defendant believes that the series of transactions should be examined at as a unit.

Defendant primarily relies on a central district case, which the Ninth Circuit remanded to the Ninth Circuit Bankruptcy Appellate Panel with instructions to affirm, In re Parkway Calabasas, Ltd. 89 B.R. 832 (Bankr. C.D. Cal. 1988), rev'd sub nom. Gill v. Sierra Pac. Const., No. 88-1993 (9th Cir. B.A.P. filed Dec. 11, 1990), rev'd, 949 F.2d 1058 (9th Cir. 1991). In *Calabasas*, the bankruptcy court analogized substantive consolidation to a merger of two corporations under state law and held that the substantive consolidation of the two bankruptcy cases resulted in a

---

[4] The Court notes, but without deciding, that under the Bankruptcy Code's broad definition of transfer, the re-characterization of the journal entry may constitute a transfer.

single case, a single estate, and a single body of creditors. *Id. at 836, 840*. The court reasoned that the purpose of fraudulent transfer law was to protect the asset base of a debtor for the benefit of unsecured creditors and if the Debtors were substantively consolidated, the harm to one debtor's creditors from a fraudulent transfer would be eliminated. *Calabasas, 89 B.R. at 839*.

The Court is not persuaded by Defendant's argument. First, *Calabasas* is factually distinguishable from the **[*22]** instant case because it dealt with an alleged fraudulent conveyance where debtors had been substantively consolidated, and, specifically, where one debtor paid the defendant for a debt owed by another debtor. *Calabasas, 89 B.R. at 834*. Here, the nature of the transfers is disputed (short-term loan v. distribution), and neither party has alleged that the transfer of the funds was payment for a debt owed by another debtor.

Next, the plaintiff in *Calabasas* only alleged constructive fraudulent conveyance claims. *Id. at 836, 838-839*. Here, Plaintiff has alleged both intentional and constructive fraud claims, and the Court does not find *Calabasas'* reasoning applicable or persuasive to Plaintiff's intentional fraud claims. Among other things, *11 U.S.C. § 548(a)(1)(A)* and *Cal. Civ. Code § 3439.04(a)(1)* do not require an analysis of whether funds were ultimately transferred back to that debtor, or another, later consolidated debtor, or whether the transferring debtor's creditor body was harmed by the intentional fraud. The Court also finds the reasoning in *Calabasas* distinguishable here, because Plaintiff alleges the transfers were capital distributions, <u>and</u> not repayment of a debt as in *Calabasas*.[5] Thus, to the extent the transfer was a distribution, it appears that both Empire Land's creditors **[*23]** and the Debtors' substantively consolidated creditor body may have been harmed, because neither Empire Land nor Debtors' consolidated estate may have received reasonably equivalent value. *See Calabasas, 89 B.R. at 838* (the purpose of fraudulent transfer law is to protect the asset base of a debtor for the benefit of unsecured creditors). *See also* discussion *infra* regarding Reasonably Equivalent Value in Section V. C.

Last, the Court does not find *Calabasas* helpful in analyzing whether or not a transfer took place. As set forth above, Defendant's approach to view the series of transactions as a whole appears to follow the control test, which is not followed by the Ninth Circuit. The Ninth Circuit has explicitly adopted the dominion test, which examines whether the entity who received the transfer had legal title to the property and could have used the funds/property any way it wanted. As set forth above, the Court finds **[*24]** that there is a disputed fact whether Defendant had dominion over the funds. *See supra* Section A. Thus, the Court finds there is a disputed fact whether the $9.6 M transfer took place.

B. <u>Intent to Hinder, Delay or Defraud</u>

Defendant argues that Plaintiff cannot succeed on his intentional fraud claims because Plaintiff cannot prove actual intent to hinder, delay, or defraud a creditor. Plaintiff may avoid a transfer of the debtor in property, if the debtor made such transfer with actual intent to hinder, delay, or defraud a creditor. *11 U.S.C. § 548(a)(1)(A)*; *Cal Civ. Code § 3439.04(a)(1)*. "Because there is rarely direct evidence of actual fraud, courts look to circumstantial evidence, and frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized badges of fraud." *Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 805-806 (9th Cir. 1994)*; *Grochocinski v. Knippen (In re Knippen), 355 B.R. 710, 722 (Bankr. N.D. Ill. 2006)*.

The Ninth Circuit has identified the most common circumstantial indicia of fraudulent intent at the time of the transfer as: "(1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, **[*25]** after the transfer, (5) retention by the debtor of the property involved in the putative transfer." *Acequia, 34 F.3d at 806*. "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id.*

---

[5] In Calabasas, the court reasoned that the creditors of the debtor who made the payment were harmed, and the creditors of debtor whose debt had been paid were unjustly enriched, but a merger of the two debtors eliminated the harm to the one creditor body and the unjust enrichment to the other. *Calabasas, 89 B.R. at 839*.

Under *§ 3439.04(b)* the following factors that may be considered to determine actual intent set forth under *§ 3439.04(a)(1)*:

(1) Whether the transfer or obligation was to an insider.

(2) Whether the debtor retained possession or control of the property transferred after the transfer.

(3) Whether the transfer or obligation was disclosed or concealed.

(4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(5) Whether the transfer was of substantially all the debtor's assets.

(6) Whether the debtor absconded.

(7) Whether the debtor removed or concealed assets.

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the **[*26]** obligation was incurred.

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

*Cal. Civ. Code § 3439.04(a)(1)*.


*1. $9.6 M and $4 M Transfers*

Here, on one hand, there is no evidence of actual or threatened litigation against Empire Land, or that Empire Land retained possession or control of the funds. On the other hand, Plaintiff has provided evidence of Empire Land's insolvency at the time of the transfers [*See* William Haegele "Haegele" and Timothy Sullivan "Sullivan" Reports] and of a special relationship between Empire Land and Defendant (Defendant was Empire Land's managing member) [*See* Bransten Dec. Exhibits D, F, Q, S, Z, and PSUF #5]. Plaintiff relies on the expert reports of Haegele and Sullivan to establish the debtors' (Empire Land and Empire Global) insolvency. Haegele relies on the Sullivan Report in reaching his conclusion that Empire Land was insolvent by December 31, 2006. *See infra* Section E. 2 regarding Empire Land's insolvency. Exhibits D, F, Q, and S are e-mails between Larry Day[6] and Ken Ogren[7] and the Memo from **[*27]** Ken Ogren, which all indicate in order to make liquidity covenants with IndyMac true, it was necessary to effect a short-term "borrowing", and as a result of the "loans" Empire Land was able to satisfy the liquidity covenants. Moreover, the facts reflect that the transfers occurred shortly before substantial debt was incurred. Drawing all logical inferences in favor of Plaintiff, the Court finds that Plaintiff has produced sufficient evidence regarding badges of fraud to raise a disputed fact as to intent to hinder delay or defraud creditors as to transfers from Empire Land ($9.6 M transfer and $4 M transfer).

---

[6] Larry Day was the Executive Vice President & Chief Legal Officer, and Secretary of Defendant [Answer filed 4/6/12, Docket No. 105, Adv. No. 6:10-ap-01319].

[7] Ken Ogren worked for Lipsey, Yougren, Means, Ogren & Sandberg, LLP, who were employed by Debtors to serve as tax accountants [Order Granting Application to Employ Lispey, Yougren, Means, Ogren & Sandberg, LLP entered on 8/12/2008, Docket No. 305, Case No. 6:08-bk-14592].

*2. $1.4 M Transfer*

Similarly, there is no evidence of actual or threatened litigation against Empire Global, or that Empire Global retained possession or control **[*28]** of the funds. However, Plaintiff has presented evidence of Empire Global's insolvency [*See* Haegele and Sullivan Reports]. *See* Section E. 2 *infra* regarding Empire Global's insolvency. Additionally, a special relationship existed between Empire Global and Defendant because Defendant was Empire Global's general partner [PSUF #2]. More importantly, as set forth above, the e-mails between Larry Day and Ken Ogren and the Memo from Ken Ogren discuss that in order to make liquidity covenants with IndyMac true, it was necessary to effect short-term "borrowing", and as a result of the "loans" Empire Land was able to satisfy the liquidity covenants (the $1.4 M transfer by Empire Global was allegedly included in a series of transactions, which reduced Empire Land's liabilities by approximately $1.4 M). Moreover, the facts reflect that the transfers occurred shortly before substantial debt was incurred. Again, drawing all logical inferences in favor of Plaintiff, the Court finds that Plaintiff has produced sufficient evidence regarding badges of fraud, to raise a disputed fact as to intent to hinder delay and defraud creditors as to the $1.4 M transfer from Empire Global.

C. Reasonably Equivalent **[*29]** Value

Defendant argues that Plaintiff cannot succeed on his constructive fraud claims because Plaintiff cannot prove that Debtors did not receive reasonably equivalent value for the transfers. This argument stems from Defendant's previous argument that there were no transfers with respect to the $9.6 M and $4 M transfers because the Debtors were substantively consolidated. Defendant immediately gave the $9.6 M transfer to Aviat (Empire Land's substantively consolidated co-debtor), which Defendant alleges was part of a series of inter-company loans. With respect to the $4 M transfer, Defendant argues that the ledger entries, which the Trustee alleges are actionable, were reversed at the same instant, so that whatever theoretical "value" was transferred went first in one direction and then the next instant reversed and immediately flowed back, resulting in, if anything, an exchange of identical value. As to the $1.4 M transfer, the Note received by Defendant was ultimately given to Empire Land (Empire Global's substantively consolidated co-debtor).

Whether or not reasonably equivalent value was provided in exchange for a transfer is a question of fact. *Devon Mobile Communs. Liquidating Trust v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.), 2006 Bankr. LEXIS 4600, 38-39 (Bankr. S.D.N.Y. Mar. 6, 2006).* "It is far from established that **[*30]** the direct satisfaction of antecedent debt is the only way of ascertaining reasonably equivalent value, however. In determining value, the Court makes a twofold inquiry: whether the debtor received any value at all in exchange for the transfer; i.e. any realizable commercial value as a result of the transaction, and whether that value was in fact reasonably equivalent to the cash transferred by the debtor." *Id.* However, a distribution on account of a partnership interest relative to an investor's capital contribution is not "reasonably equivalent value" as defined by the Bankruptcy Code. *AFI Holding, Inc. v. Mackenzie, 525 F.3d 700, 704 (9th Cir. 2008)* (citing *In re Agricultural Research & Tech. Group, Inc., 916 F.2d 528, 540 (9th Cir. 1990)).* Additionally, "[d]ividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value." *5-548 Collier on Bankruptcy P 548.05* (16th ed. 2015).

Here, while Defendant alleges and has provided evidence that the transfers were inter-company loans, Plaintiff has provided evidence that the transfers were contributions or distributions [*See* Bransten Dec. Exhibits D, F, Q, R, S, V, Z, and DD]. The Court finds that there is a disputed fact as to the characterization of the transfers, and in order to determine whether or not debtors (Empire Land and **[*31]** Empire Global) or Debtors received reasonably equivalent value, the nature of the transfers must be established. Thus, as there is a dispute of fact regarding the characterization of the transfers, the Court finds that Plaintiff has set forth sufficient evidence to establish a disputed fact whether debtors (Empire Land and Empire Global) or Debtors received reasonably equivalent value for the transfers.

D. Insolvency

Defendant argues that Plaintiff cannot meet his burden in proving that Debtors were insolvent at the time of the alleged transfers. In order to prove a claim under *11 U.S.C. § 548(a)(1)(B)(i)* and *(ii)(I)* and *Cal. Civ. Code § 3439.04(b)(2)*, Plaintiff must establish that debtor was insolvent at the time of the transfer, or became insolvent as a result of the transfer. Additionally, insolvency is identified as a badge of fraud to support a claim under *11 U.S.C. § 548 (a)(1)(A)* and *Cal. Civ. Code § 3439.04(a)(1)*. As set forth above, Plaintiff relies on the expert reports of Haegele and Sullivan to establish debtors' (Empire Land and Empire Global) insolvency.

*a. Credibility of Haegele*

Defendant questions the reliability of Plaintiff's expert report by Haegele, and requests that the Court exercise its gate keeping function and exclude Haegele's report because Haegele's methodology in determining **[\*32]** Empire Land and Empire Global's insolvency is flawed. Specifically, Defendant objects to Haegele's report because he examined the insolvency of the certain debtors on an individual basis instead of all Debtors on a consolidated basis, it does not appear he considered the actual sale price of Anaverde, and he double counted the Wachovia Loan.

Initially, the Court notes that Defendant does not provide any evidence to challenge or controvert Haegele's report. Thus, Defendant's arguments regarding the credibility of the Haegele report ask the Court to weigh the credibility and attack the methodology of Haegele's report, without any contradictory evidence.[8] Thus, the Court finds Defendant's arguments alone, without any supporting evidence, are insufficient to exclude the Haegele report at this stage. Moreover, the Court finds that weighing the credibility of the Haegele report not an issue appropriate to be resolved in this Motion.

Next, the Court is unpersuaded by Defendant's argument that Plaintiff must establish the insolvency of the Debtors on a substantively consolidated basis versus an entity by entity basis. Defendant's argument is primarily premised on the fact that Debtors' bankruptcy cases were substantively consolidated by the Consolidation Order, and as such, by operation of law the Consolidation Order requires Plaintiff to prove Debtors' insolvency on a substantively consolidated basis. However, Defendant has not provided any legal authority in its papers to support this position. Defendant argues that the findings of fact and conclusions of law issued in connection with the Consolidation Order require this Court to examine the Debtors' insolvency on a consolidated basis. While Defendant does not cite any law regarding this position, parties discussed this issue at length at the January 21, 2015 hearing. Plaintiff cites to *Total Technical* to support his argument that insolvency should be examined on an entity by entity basis. *Total Technical Servs., Inc. v. Whitworth, 150 B.R. 893 (Bankr. D. Del. 1993)*. In *Total Technical*, even though the two debtors were substantively consolidated, the court determined that it would examine only the insolvency of the debtor who made **[\*34]** the alleged preferential transfers. *Id. at 899-900*.

In reaching this conclusion, the court noted that the order substantively consolidating the debtors did not have any findings that the debtors were treated on a consolidated basis **during the period in question** (i.e. the time in which the transfers at issue were made). *Id. at 900* (citing *Cissell v. First Nat'l Bank, 476 F. Supp. 474, 479 (S.D. Ohio 1979)* (court found that the parties had treated the debtors as a consolidated unit **during the period in question**, and thus examined the insolvency of the debtors on a consolidated basis)) (**emphasis added**). Here, while the findings of fact for the Consolidation Order made findings as to the close relationship of the Debtors pre-petition, there is no specific finding as to any date by which the Debtors were deemed treated as "consolidated" until the Petition Date, which was subsequent to the transfers. Thus, the Court finds that neither party has established whether insolvency should be examined on an individual or consolidated basis, because neither party has provided evidence whether Debtors were "consolidated" during the time of the transfers.

*b. Solvency of Empire Global*

---

[8] The Court is not making any findings regarding the methodology used by Haegele (whether to consider the actual sale price of Anaverde and whether the Wachovia loan may be double counted); only that Plaintiff has presented sufficient evidence to create an issue for **[\*33]** trial.

Defendant argues that even if the Court were to consider the Haegele report, it does not opine as to the insolvency **[\*35]** of Empire Global and does not set forth the insolvency of Empire Global and Empire Land on the date the alleged transfers occurred.

The Haegele report opines that Prestige was insolvent **by** March 31, 2007, Empire Land was insolvent **by** December 31, 2006, and ERC was insolvent **as of** December 31, 2006, March 31, 2007, and June 30, 2007. Plaintiff argues that because (1) Aviat was a holding company that had a 99% ownership in both Prestige and ERC, Aviat was also insolvent as of March 31, 2007, and (2) Empire Global was a holding company that had a 99% interest in both Aviat and Empire Land, Empire Global was also insolvent as of March 31, 2007 because Empire Land, Prestige, and ERC were all insolvent. Here, drawing all inferences in a light most favorable to the non-moving party, the Court finds that Plaintiff has identified sufficient evidence to create a triable issue with respect to Empire Land and Empire Global's insolvency on the dates of the respective transfers.

E. State Law Claims

Defendant argues that Plaintiff cannot prevail on his claims regarding violation of California limited liability company or partnership law because Plaintiff does not have any evidence to support his claims **[\*36]** that a distribution took place. *See Cal. Corp. Code §§ 15906.06* and *17704.06*. As set forth above, the Court finds that Plaintiff has provided evidence to establish a disputed fact as to whether the distributions took place.

Additionally, Defendant argues that even if Plaintiff can establish the transfers occurred, Plaintiff has not produced evidence to show that the transfers are distributions as defined under *Cal. Corp. Code § 15901.02(f)*. *Section 15901.02(f)* defines a distribution as "a transfer of money or other property from a limited partnership to a partner in the partner's capacity as a partner or to a transferee on account of a transferable interest owned by the transferee." *Cal. Corp. Code § 15901.02(f)*. Here, Trustee has presented a tax return of Empire Land, which reflects a distribution of $9.6 M and $4 M and a tax return of Empire Global, which reflects a distribution of $1.4 M [*See* Bransten Dec. Exhibits R and DD]. Exhibits R and DD are tax returns for Empire Land and Empire Global respectively, which reflect distributions of the alleged transfers [PSU #2 and 5]. Moreover, as set forth above, the Court finds there is a disputed fact regarding the characterization of the transfers (short term loan v. distribution). Additionally, the Court notes that Defendant was either the managing **[\*37]** member or managing partner of Empire Land and Empire Global. Accordingly, the Court finds that Plaintiff has identified sufficient evidence to create a disputed fact that a distribution, as defined under *§ 15901.02*, from Empire Land and Empire Global to Defendant occurred.

Date: April 4, 2016

/s/ Mark Houle

Mark Houle

United States Bankruptcy Judge

**End of Document**

 Positive
As of: March 31, 2026 8:15 PM Z

# *Schoenmann v. BCCI Constr. Co. (In re NorthPoint Communs. Group, Inc.)*

United States Bankruptcy Appellate Panel for the Ninth Circuit

October 26, 2007, Argued and Submitted at Sacramento, California; November 7, 2007, Filed

BAP No. NC-07-1128-KDCa

**Reporter**
2007 Bankr. LEXIS 4931 *

In re: NORTHPOINT COMMUNICATIONS GROUP, INC., et al., Debtors. E. LYNN SCHOENMANN, Trustee, Appellant, v. BCCI CONSTRUCTION CO., aka BRENT CONSTRUCTION, Appellee.

**Notice:** This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see *Fed. R. App. P. 32.1*), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Northern District of California. Honorable Thomas E. Carlson, Bankruptcy Judge, Presiding. *Bk. No. 01-30127. Adv. No. 03-03051, 361 B.R. 149*.

*Schoenmann v. BCCI Constr. Co. (In re Northpoint Communs. Group, Inc.), 361 B.R. 149, 2007 Bankr. LEXIS 456 (Bankr. N.D. Cal., 2007)*

**Disposition:** AFFIRM.

## Core Terms

third party, transferee, conduit, disburse, preferential transfer, fraudulent, transfer of property, controlling test, mixed

## Case Summary

**Procedural Posture**

Appellant bankruptcy trustee appealed from the judgment of the United States Bankruptcy Court for the Northern District of California, ruling that a putatively avoidable transfer of $204,532 was not recoverable from appellee general contractor as a preferential transfer because the contractor was a "mere conduit" and not a "transferee" under *11 U.S.C.S. § 550(a)(1)*.

**Overview**

The bankruptcy court was correct in determining that the contractor was not a "transferee" from whom the trustee could recover under *11 U.S.C.S. § 550(a)(1)*. The bankruptcy court correctly applied the dominion test by deeming the transfer to be a two-step transaction. Debtor transferred the funds to the contractor who then had a legal obligation to disburse the payments to the third parties. Evidence submitted at trial and ample oral testimony supported the bankruptcy court's findings and judgment. Similarly, the contractor had no dominion over the money nor could it have used the money for its own purposes because of its legal obligation to disburse the money to the third parties. There was a two-step transaction as to which a binding legal relationship between the contractor and the third parties was established by three letters and the understanding of the financial arrangement among the parties to the transaction. The contractor was under a legal obligation to disburse the funds to the third parties upon

receipt of the payments from debtor and, thus, did not have the freedom (without incurring liability) to decide if, when, and how it disbursed the funds.

**Outcome**
The judgment of the bankruptcy court was affirmed.

# LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

*HN1* Appellate courts review findings of fact for clear error and issues of law de novo. Appellate courts review mixed questions of law and fact de novo. A mixed question exists when the facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule. Mixed questions require consideration of legal concepts and the exercise of judgment about the values that animate legal principles.

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > General Overview

*HN2* If a transfer is avoidable under one of the enumerated trustee avoiding powers, including preferential and fraudulent transfers, *11 U.S.C.S. § 550(a)(1)* authorizes the trustee to recover from the "initial transferee" or the entity for whose benefit such transfer was made. *11 U.S.C.S. § 550(a)(1)*.

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > Evidence & Procedural Matters

*HN3* Pursuant to *11 U.S.C.S. § 550(a)*, a preferential transfer is recoverable only if the entity qualifies as a "transferee." To the extent that a transfer is avoided: the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from —(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee. *11 U.S.C.S. § 550(a)*.

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > Evidence & Procedural Matters

*HN4* The general rule is that the party who receives a transfer of property directly from the debtor is the initial transferee. However, in cases in which a two-step transaction exists (A transfers property to B as agent for C), the conduit rule, which is an equitable exception to the general rule, has emerged. Under this line of cases, courts have developed two standards to determine whether a party is an initial transferee or a mere conduit: the dominion test and the control test. Although courts have at times confused the terms, the United States Court of Appeals for the Ninth Circuit and the United States Bankruptcy Appellate Panel for the Ninth Circuit have consistently applied the dominion test where appropriate, and have declined to adopt the control test.

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > Evidence & Procedural Matters

*HN5* Under the dominion test, a "transferee" is one who has "dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the initial transferee; the agent may be disregarded. The dominion test focuses on whether the recipient of the funds has legal title to them and the ability to use the money as it sees fit.

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > Evidence & Procedural Matters

*HN6* The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit. The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question.

**Judges:** Before: KLEIN, DUNN and CARROLL,[**] Bankruptcy Judges.

# Opinion

**MEMORANDUM**

This is an appeal from a judgment ruling that a putatively avoidable transfer of $204,532 was not recoverable from appellee as a preferential transfer because the appellee was a "mere conduit" and not a "transferee" under *11 U.S.C. § 550(a)(1)*. We AFFIRM.

FACTS

Debtor NorthPoint Communications Group, Inc. was a nationwide internet service provider. Appellee BCCI Construction Co., aka Brent Construction, was debtor's general contractor for the debtor's tenant improvements on leased properties in the San Francisco Bay area.

In late November 2000, Verizon cancelled a pending merger with NorthPoint, causing NorthPoint to begin discussions on early termination of some of its leases. Debtor requested that appellee, as its general contractor, provide it with a summary of all amounts that were owed to all the contractors on debtor's Bay **[*2]** Area projects. The summary provided included the debt amounts to three other entities ("Third Parties"), which were not subcontractors of appellee, but rather, had contracted directly with debtor to provide services on the same construction projects on which appellee was working.[1]

In mid-December 2000, debtor asked appellee to obtain from the Third Parties payment amounts due and lien releases so that any mechanics liens or other liens could be cleared from the various properties. On behalf of debtor, appellee obtained from the Third Parties the amounts due, which totaled $204,532, and agreements that appellee would forward payments to the Third Parties upon receipt of funds from debtor.

On December 19, 2000, appellee sent debtor a $1,469,176 invoice that included the $204,532 owed to the Third Parties.

Debtor paid the $1,469,176 in three installments. On December 28, 2000, debtor wired appellee $750,000. On January 12, 2001, debtor paid appellee $304,577.90 by check drawn on **[*3]** debtor's payroll account. On March

---

[**] Hon. Peter H. Carroll, U.S. Bankruptcy Judge for the Central District of California, sitting by designation.

[1] The three entities were: Cole Project Management, which provided project management services; the Smith Group, which provided architectural services; and FACS, which provided furniture and installation services.

16, 2001, debtor wired appellee the $414,599 balance.[2] The first two payments covered multiple invoices and obligations to both the appellee and the Third Parties.

On January 5, 2001, from the first funds received, appellee transmitted the $204,532 to the Third Parties.[3]

On January 16, 2001, debtor filed for bankruptcy relief under chapter 11, which case was later converted to chapter 7.[4] Appellant E. Lynn Schoenmann was appointed as trustee of the debtor's estate. Debtor immediately moved to sell substantially all of its operating assets. By order entered on March 22, 2001, those assets were sold to AT&T for $135 million.

On July 25, 2006, appellant filed the underlying adversary proceeding,[5] which sought to recover payments totaling $1,054,578 that debtor made to appellee in December 2000 and January 2001. In particular, appellant sought to recover the $204,532 that appellee had received on behalf of, and transmitted to, the Third Parties as constructively fraudulent transfers ("Third Party Payments") and the remaining $850,046 as preferential transfers.[6]

After trial on November 28, 2006, the court published an Opinion that contained findings of fact and conclusions of law, _Schoenmann v. BCCI Constr. Co. (In re NorthPoint Commc'ns Group, Inc.), 361 B.R. 149 (Bankr. N.D. Cal. 2007)_, and entered Judgment on February 12, 2007.

In the portion of the judgment that is not questioned on appeal, the trial court concluded that appellee had established an "ordinary course of business" defense for $811,689 of the $850,046 in allegedly preferential payments under _11 U.S.C. § 547(c)(2)(C)_ (transfer must have been made "according to ordinary business terms") and awarded the appellant $38,357 plus pre-judgment interest for the portion of the funds in which appellee had not established an "ordinary course" defense to the allegations of preference.

In addition, as relevant to this appeal, the court also determined that appellant could not recover the $204,532 in Third Party Payments as fraudulent conveyances. The court held that appellant did not establish that appellee was a "transferee" of those payments under _11 U.S.C. § 550(a)_ and did not  **[*6]** establish that debtor did not receive reasonably equivalent value for those payments pursuant to _11 U.S.C. § 548(a)(1)(B)_. It concluded that appellee was a "mere conduit" and not a "transferee" from whom a trustee may recover because appellee received the Third

---

[2] The $414,599 was wired to appellee after the bankruptcy filing and while debtor remained in possession; however, trustee does not seek to recover this transfer because the pre-petition nature of the payment was not discovered within two years of filing bankruptcy.

[3] Invoice number 389, dated December 28, 2000, specifies the payments to be made to the Third Parties:

| Cole (project manager): | $9,633.50 |
| FACS (furniture): | $91,485.50 |
| Smith Group (architect): | $103,412.50 |
| Total | $204,531.50 |

[4] Debtor, along with three of its affiliates, filed separate voluntary  **[*4]** petitions for chapter 11 relief on January 16, 2001. The cases were ordered converted to cases under chapter 7 on June 12, 2001.

[5] Trustee initially commenced a large number of adversary proceedings on January 8, 2003 to recover alleged preferential transfers made by debtor. After it was discovered that recovery was sought against appellee, as BCCI Construction Co. and Brent Construction, in two separate adversary proceedings, the proceedings were consolidated by stipulation.

[6] The issue of debtor's solvency during the preference period was tried separately in a proceeding involving several of the defendants in different preference actions. The court determined that debtor would be considered to have been insolvent during the entire ninety days prior to  **[*5]** bankruptcy for all purposes in all NorthPoint preference and fraudulent conveyance action adversary proceedings.

Party Payments subject to a contractual obligation to transfer the funds to the Third Parties. Moreover, the court concluded that debtor had received reasonably equivalent value for the Third Party Payments, because the payments were promptly transferred to the Third Parties in satisfaction of debtor's obligations to those Third Parties.

Appellant then moved for reconsideration on the alternative ground that the $204,532 in Third Party Payments were preferential transfers.

The appellant asserted that the court applied the incorrect legal standard for determining that appellee was a "mere conduit" rather than a "transferee." She contended that _Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors of Incomnet Commc'ns Corp. (In re Incomnet, Inc.), 463 F.3d 1064 (9th Cir. 2006)_, aff'g _Incomnet Comm. Corp. v. Universal Serv. Administ. Co. (In re Incomnet, Inc.), 299 B.R. 574 (9th Cir. BAP 2003)_ ("Incomnet"),  **[*7]** rather than _Danning v. Miller (In re Bullion Reserve of North Am.), 922 F.2d 544 (9th Cir. 1991)_ ("Bullion Reserve"), governed the "transferee" issue. The appellant also asserted that the evidence did not support the trial judge's factual finding that appellee was under a contractual duty to pay the Third Parties the $204,532 received from debtor.

The court, ruling that the precise theory of avoidance was immaterial to _§ 550(a)(1)_, denied trustee's motion for reconsideration on March 28, 2007, again ruling that the appellee was a "mere conduit" and not a "transferee" of the Third Party Payments. The court held that Incomnet was inapplicable because it did not involve a two-step transaction, unlike the present case. Because the court ruled that appellee was not a "transferee," the court concluded appellant could not recover the Third Party Payments, regardless of whether appellant's theory for avoidance was preferential transfer or fraudulent conveyance.

This appeal, focusing only on whether appellee qualified as an "initial transferee" under _11 U.S.C. § 550(a)(1)_, which would entitle appellant to recover the $204,532 in payments disbursed to the Third Parties, ensued.[7]

JURISDICTION

The bankruptcy court had jurisdiction via _28 U.S.C. § 1334_. We have jurisdiction under _28 U.S.C. § 158(a)(1)_.

ISSUE

Whether the court erred in holding that the $204,532 in funds appellee received from debtor and disbursed to the Third Parties were not recoverable by the appellant as preferential transfers because appellee was a "mere conduit" rather than an "initial transferee" of the Third Party Payments under _11 U.S.C. § 550(a)(1)_.

STANDARD OF REVIEW

_HN1_ We review findings of fact for clear error and issues of law de novo. _Hoopai v. Countrywide Home Loans, Inc. (In re Hoopai), 369 B.R. 506, 509 (9th Cir. BAP 2007)_. We review mixed questions of law and fact de novo. _Murray v. Bammer (In re Bammer), 131 F.3d 788, 792 (9th Cir. 1997)_. A mixed question exists when the facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule. Id. Mixed questions  **[*9]** require consideration of legal concepts and the exercise of judgment about the values that animate legal principles. Id. Whether an entity is a "transferee" or a "mere conduit" is such a question.

DISCUSSION

The narrow issue before us is whether, under _§ 550(a)(1)_, the court erred in determining the mixed question of law and fact that appellee qualified for the "mere conduit" exception to "transferee" status with respect to the $204,532 disbursed to the Third Parties. Case law construing the meaning of the statutorily undefined term "transferee" has

---

[7] Appellant notes  **[*8]** that she is not appealing the bankruptcy court's finding that the Third Party Payments were not fraudulent transfers. Her only basis of appeal is that the court erred on the issue of whether appellee was a transferee of these funds and whether those transfers constituted preferential transfers.

developed a "mere conduit" exception to "transferee" status, which we describe before discussing its application to this case.

I

*HN2* If a transfer is avoidable under one of the enumerated trustee avoiding powers, including preferential and fraudulent transfers, *§ 550(a)(1)* authorizes the trustee to recover from the "initial transferee" or "the entity for whose benefit such transfer was made."[8] *11 U.S.C. § 550(a)(1)*.

*HN4* The general rule is that the party who receives a transfer of property directly from the debtor is the initial transferee. *Incomnet, 299 B.R. at 578*. This applies to one-step transaction cases. See *Incomnet, 299 B.R. at 580-81* (transfer was one-step transaction in which party determined to be "transferee" did not collect funds as agent for third party).

However, in cases in which a two-step transaction exists (A transfers property to B as agent for C), the "conduit" rule, which is an equitable exception to the general rule, has emerged. Under this line of cases, courts have developed two standards to determine whether a party is an "initial transferee" or a "mere conduit": the "dominion test" and the "control test."

Although courts have at times confused the terms, the Ninth Circuit and this Panel have consistently applied the dominion test where appropriate, and have declined to adopt the control test. *Incomnet, 463 F.3d at 1064* (affirming [*11] Panel holding dominion test did not apply to this one-step transaction case); *Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen), 300 F.3d 1097, 1102 n.2 (9th Cir. 2002)*; *Bullion Reserve, 922 F.2d at 548* (adopting test from Seventh Circuit in leading case in this area, *Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir. 1988))*; *Incomnet, 299 B.R. at 580-81*; *McCarty v. Richard James Enters., Inc. (In re Presidential Corp.), 180 B.R. 233, 237-38 (9th Cir. BAP 1995)*.

*HN5* Under the dominion test, a "transferee" is one who has "dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Bullion Reserve, 922 F.2d at 548*. The dominion test focuses on whether the recipient of the funds has legal title to them and the ability to use the money as it sees fit. *Incomnet, 463 F.3d at 1070-71*.

In contrast, the Eleventh Circuit applies the control test, which "simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable."[9] *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.), 848 F.2d 1196, 1199 (11th Cir. 1988)*.

---

[8] *HN3* Pursuant to *§ 550(a)*, a preferential transfer is 8 recoverable only if the entity qualifies as a "transferee." To the extent that a transfer is avoided:

the trustee may recover, for the benefit of the estate,

the property transferred, [*10] or, if the court so orders,

the value of such property from —

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

*11 U.S.C. § 550(a)*.

[9] The [*12] Ninth Circuit has explained the difference between the two tests:

II

Appellant now seeks recovery under *§ 550(a)* of the $204,532 received and transmitted by the appellee as preferential transfers under *§ 547*. The court ruled that, regardless of whether the payments were preferences or fraudulent transfers, the appellant could not recover the Third Party Payments from appellee because appellee was not a "transferee" under *§ 550(a)*. It determined that appellee was a "mere conduit" in a two-step transaction with a **[*13]** contractual duty to disburse the funds to the Third Parties, as set forth in *Bullion Reserve, 922 F.2d at 549*. Because the court decided that appellee was not a "transferee" in the first place, the court determined it was immaterial whether the Third Party Payments were avoidable, either as preferential transfers or fraudulent conveyances.

Appellant, on the other hand, contends that the court applied the incorrect legal standard in its "conduit" analysis, arguing that the appellee is a "transferee" under Incomnet because the appellee did not fall within the line of cases in which the "conduit" rule applied. See *Incomnet, 299 B.R. at 578*.

We hold that the court was correct in determining that the appellee was not a "transferee" from whom the appellant could recover the $204,532 under *§ 550(a)(1)*. The court correctly applied the dominion test by deeming the transfer to be a two-step transaction. Debtor transferred the funds to appellee who then had a legal obligation to disburse the payments to the Third Parties. Evidence submitted at trial and ample oral testimony supports the court's findings and judgment.

In Bullion Reserve, the court concluded that the defendant had no dominion over **[*14]** the money and could not put the money to his own purposes because he was under a contractual duty immediately to transfer the property to the third party. *Bullion Reserve, 922 F.2d at 549*. Similarly, the appellee had no dominion over the money nor could it use the money for its own purposes because of its legal obligation to disburse the money to the Third Parties.

As appellee argues, a valid contract was created in writing and by the conduct of the parties. Letters from each of the Third Parties to appellee set forth the specific amounts due and acknowledged the agreement that appellee would be responsible to forward payment to the Third Parties upon receipt of funds from debtor.[10] In addition, testimony during trial established that an oral agreement had been formed among the parties to the transaction. The bankruptcy court explained:

> Bryce Mason (of Northpoint) testified that he asked Defendant to determine the amounts owed the Third Parties, to include those amounts in the invoices submitted by Defendant to Northpoint, to receive payment from Northpoint of the sums due the Third Parties, and to forward that payment from Northpoint to the Third Parties. Michael Scribner (of Defendant **[*15]** BCCI) testified that he agreed with Mason to perform this role for Northpoint, and that he also reached agreement with each of the Third Parties (Cole, FACS, and the Smith

---

While the two inquiries are similar, they are not indistinguishable: **HN6** The dominion test focuses on whether the recipient of funds has legal title to them and the ability to use them as he sees fit. See *Bonded Fin. Servs., 838 F.2d at 893-94*. The control test takes a more gestalt view of the entire transaction to determine who, in reality, controlled the funds in question. *In re Chase & Sanborn Corp., 848 F.2d at 1199*. Since we have explicitly adopted the "'more restrictive 'dominion test,'" set out in *Bonded Fin. Servs., In re Cohen, 300 F.3d at 1102 n.2*, we take care not to apply the more lenient "control test" put forth in In re Chase & Sanborn Corp.

*Incomnet, 463 F.3d at 1071*.

[10] Each of the letters stated:

[Third Party] fully acknowledges that on behalf of NorthPoint Communications . . . and said company that BCCI has agreed to help expedite the final payment process for all work related to the NorthPoint projects. [Third Party] agrees to hold BCCI harmless for all cause of action for payments or monies owed over and above payment . . . amount. . . . The undersigned acknowledges this document as an Unconditional Waiver and Release upon final payment [of] amount.

(Pl.'s Request for Admis. Set One Ex. S, T, U at 113-15.)

Group) to perform this role on their behalf. Robert Middleton (of Cole) testified that he agreed to this arrangement. The assent of FACS and the Smith Group is evidenced in Exhibit O.

(Ct.'s Mem. re Pl.'s Mot. for Reconsideration at 2:18-28.) It is apparent that the trial court believed that testimony.

Furthermore, the December 28, 2000, invoice that appellee sent to debtor specified the same three payments, totaling $204,532, that the Third Parties had referenced in their letters. **[*16]** And, after appellee received the first bulk payment at the end of December from debtor, appellee immediately made the payments to the Third Parties on January 5, 2001, totaling $204,532.

Although the appellant contends that the funds went into appellee's general account and were subject to levy,[11] the court concluded that the evidence of the oral agreements was sufficient to establish that appellee was the agent of both NorthPoint and the Third Parties with respect to the payments in question. We agree. The court did not err in determining that appellee was not a "transferee" under *§ 550(a)(1)*, but was merely a "conduit" that disbursed the funds received from debtor to the Third Parties.

The facts in Incomnet are distinguishable because that case did not involve **[*17]** a two-step transaction. *Incomnet, 299 B.R. at 580*. Both the Panel and the Ninth Circuit decisions in Incomnet held that defendant did not demonstrate a two-step transaction to which the dominion test could be applied, and that defendant qualified as a "transferee" because it did not establish any binding legal relationship between the defendant and any of its payment recipients that would operate to make it a "conduit;" nor could it identify any specific beneficiaries. *Incomnet, 463 F.3d at 1075*; *Incomnet, 299 B.R. at 577 n.6 & 580*. In addition, the defendant in Incomnet had the ability and authority to decide if, when, and how it disbursed the funds. *Incomnet, 463 F.3d at 1076*. In other words, if there had been a second step, it is apparent that the dominion test would have precluded the finding of a "conduit."

In contrast, here there is a two-step transaction as to which a binding legal relationship between appellee and the Third Parties was established by the three letters and the understanding of the financial arrangement among the parties to the transaction. Also, specific beneficiaries are identified in that the Third Parties and the exact amounts owed to each of them were specified. **[*18]** Moreover, unlike the defendant in *Incomnet,* the appellee was under a legal obligation to disburse the funds to the Third Parties upon receipt of the payments from debtor and, thus, did not have the freedom (without incurring liability) to decide if, when, and how it disbursed the funds.[12]

Accordingly, we agree with the bankruptcy court that the applicable dominion test reveals that appellee was a "mere conduit" of the $204,532 transferred from debtor to the Third Parties, and that Incomnet does not compel a contrary conclusion. As such, appellant is not entitled to recover $204,532 because appellee is not an "initial transferee" within the meaning of *§ 550(a)(1)*.

CONCLUSION

The court did not err in holding that the $204,532 in funds appellee received from debtor and disbursed to the Third Parties were not recoverable by the appellant as preferential transfers because appellee was a "mere conduit" rather than an "initial transferee" of the Third Party Payments under *11 U.S.C. § 550(a)(1)*. We AFFIRM.

---

**End of Document**

---

[11] Appellant's subject-to-levy argument fallaciously assumes a conclusion that a court would not have ordered that the $204,532 be released from levy because it was not the levied person's property. See *Cal. Civ. Proc. Code § 695.040* (property not subject to enforcement of money judgment may not be levied upon, and if levied upon, the property may be released pursuant to claim of exemption procedure prescribed by California law).

[12] In fact, the $204,532 was transmitted from the first funds received.

🅐 Neutral
As of: March 31, 2026 8:15 PM Z

# *Shay v. Cty. of Los Angeles*

United States District Court for the Central District of California

September 23, 2019, Decided; September 23, 2019, Filed

2:15-CV-04607-CAS (RAOx)

**Reporter**
2019 U.S. Dist. LEXIS 162400 *; 2019 WL 4598238

SHAY v. COUNTY OF LOS ANGELES ET AL.

**Subsequent History:** Request granted *Shay v. Cty. of L.A., 2019 U.S. Dist. LEXIS 178390 (C.D. Cal., Oct. 10, 2019)*

Appeal terminated, 11/22/2019

**Prior History:** *Shay v. County of L.A., 2015 U.S. Dist. LEXIS 146350, 2015 WL 6513632 (C.D. Cal., Oct. 26, 2015)*

## Core Terms

summary judgment, bail, material fact, declaration, qualified immunity, genuine dispute, law of the case, incarceration, rights, feloniously, postarrest, constitutional violation, summary judgment motion, defendants', law of the case doctrine, substantial difference, matter of law, bail hearing, moving party, deposition, Reply, theft

**Counsel:  [*1]** Attorneys for Plaintiffs: John Burton; Matt Sahak.

Attorneys for Defendants: Antonio Kizzie; Jack Altura.

**Judges:** CHRISTINA A. SNYDER.

**Opinion by:** CHRISTINA A. SNYDER

## Opinion

**CIVIL MINUTES — GENERAL**

**Proceedings**: DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (ECF No. 84, filed on August 19, 2019)

**I. INTRODUCTION**

This case arises out of the detention of plaintiff Allen B. Shay ("Shay") by defendant Detective Christopher Derry ("Detective Derry") of defendant Los Angeles County and the Los Angeles County Sheriff's Department (collectively "the County") between May 20, 2014 and May 31, 2014.

Shay filed a complaint to initiate this action on June 17, 2015. ECF No. 1 ("Compl."). Defendants filed a motion to dismiss the complaint on September 14, 2015, ECF No. 20, which the Court granted in part and denied in part on

October 26, 2015, ECF No. 23. Shay filed his second amended complaint, the operative pleading, on November 4, 2015. ECF No. 24 ("SAC"). The SAC alleges four claims for relief: (1) a claim pursuant to *42 U.S.C. § 1983* against Detective Derry for violation of Shay's *Fourth* and *Fourteenth Amendment* rights; (2) a claim pursuant to *42 U.S.C. § 1983* and *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* against the County for violation of those same rights; (3) a state law claim for violation of Shay's rights pursuant to **[*2]** *California's Bane Civil Rights Act, codified at California Civil Code § 52.1*; and (4) a state law claim for false imprisonment.

On June 5, 2017, the Court granted summary judgment to defendants on all four claims. See ECF No. 66 ("MSJ Order"). Shay appealed. See ECF No. 67. On March 6, 2019, the Ninth Circuit affirmed in part, reversed in part, and remanded for further proceedings. See *Shay v. County of Los Angeles, 762 F. App'x 416, 419 (9th Cir. 2019).* Specifically, the court affirmed judgment for defendants on Shay's *Fourth Amendment*, Bane Act, and false imprisonment claims, but held that "genuine disputes over material facts preclude summary judgment on Shay's *Eighth* and *Fourteenth Amendment* claims" against Detective Derry, as well as "Shay's associated municipal liability claim" against the County for the same violations. *Id. at 418-19* (holding that "summary judgment is inappropriate" for the latter claim).[1]

Notwithstanding the Ninth Circuit's holding and mandate, defendants filed the present second motion for summary judgment on Shay's remaining claims on August 19, 2019. See ECF No. 84 ("Motion" or "Mot."). Defendants simultaneously filed a separate statement of uncontroverted facts. ECF No. 84-1 ("SUF"). On September 2, 2019, Shay filed an opposition, ECF No. 90 ("Opposition" or "Opp."), as well as a statement of genuine issues **[*3]** of disputed facts and additional material facts in dispute, ECF No. 86 ("SGD"). On September 10, 2019, defendants filed their amended reply, ECF No. 93 ("Reply"), along with objections to certain additional facts submitted in Shay's SGD, ECF No. 92-5. Defendants did not otherwise file a response to the SGD.

The matter came before the Court for a hearing on September 23, 2019. Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are not materially disputed and are set forth for purposes of background. Unless otherwise noted, the Court references only facts that are uncontroverted and as to which evidentiary objections have been overruled. Moreover, because the facts and procedural history of this action are known to the parties and summarized in this Court's first MSJ Order, they are only briefly reviewed here.

### A. Shay's Arrest, Detention, and Release

The County filed a criminal complaint against Shay in Los Angeles County Superior Court on May 1, 2014. SGD ¶ 1. The criminal complaint charged Shay with two counts of grand theft in violation of *California Penal Code § 487(a)*, and two counts of procuring and offering a false **[*4]** or forged instrument in violation of *California Penal Code § 115(a)*. The charges arose from Shay's alleged involvement in several real estate transactions that took place between 2005 and 2007.

---

[1] The Ninth Circuit refers to Shay's claim "concerning the allegedly false declaration Derry submitted in support of a '1275 hold motion' which led to Shay being incarcerated without access to bail" as a claim for relief pursuant to the *Fourteenth* and *Eighth Amendments*. See **Shay, 762 F. App'x at 418**. But because the Ninth Circuit has held that "postarrest incarceration" claims, like this one, are "analyzed under the *Fourteenth Amendment* alone," *Tatum v. Moody, 768 F.3d 806, 815 (9th Cir. 2014)* (cited as the governing law applicable to this case in **Shay, 762 F. App'x at 419**), the Court will refer to this claim as Shay's "postarrest incarceration" or "*Fourteenth Amendment*" claim. See also Decl. of Matt Sahak, ECF No. 89 ("Sahak D."), Ex. D at 10-11 (hearing transcript wherein Shay's counsel states that Shay "allege[s] this theory . . . as a *14th Amendment* theory").

That same day, Detective Derry executed an arrest warrant for Shay, and signed a declaration in support of a *California Penal Code § 1275.1* motion for a "bail hold." SGD ¶¶ 2, 5. Pursuant to California law, a *§ 1275.1* motion allows the government to continue to detain an arrestee, notwithstanding any bail funds proffered on his or her behalf, until a bail hearing can be held to determine whether any of the bail funds were feloniously obtained. In the declaration in support of the *§ 1275.1* motion that Detective Derry and the County executed against Shay, Detective Derry stated that Shay "had access to significant amounts of monies feloniously obtained from theft," and that those "monies could be used to arrange for the posting of bail in this matter." SGD ¶ 5. The parties dispute the basis for Detective Derry's bail hearing request. At his deposition, Detective Derry stated that it was the County's "standard practice to request a bail hearing in felony theft cases," as a rule, "countywide." SGD ¶ 6. In the same deposition, Detective Derry also claims he "signed the declaration **[*5]** because . . . Mr. Shay received $50,000 that was," he alleges, "feloniously obtained." Id.

Based on the facts stated in Detective Derry's declaration, the Los Angeles County Superior Court granted the *§1275.1* bail hold motion on the date it was submitted, and ordered that the court hold a bail hearing to determine the source of any bail funds before they were accepted. SGD ¶ 9. Shay was arrested on May 20, 2014. SGD ¶ 10. On May 30, 2014, Shay appeared in Los Angeles County Superior Court for a bail hearing. SGD ¶¶ 21-22. At the hearing, the court lifted the bail hold and agreed to prepare an order permitting one of Shay's friends to post bond on his behalf. SGD ¶¶ 23, 27-28. Shay was released from custody at some point between May 30 and May 31, 2014, but the parties dispute exactly when. SGD ¶ 28.

At the preliminary hearing held on September 11, 2014, the Los Angeles County Superior Court found that the County's evidence against Shay did not support the charges against him, and declined to make Shay answer to them. MSJ Order at 7 (citing Darling Decl. ¶ 9, Ex. O at 2:13-6:28). Shay was never convicted of any of the crimes charged against him.

## B. Shay's Postarrest Incarceration Claims, and **[*6]** the Ninth Circuit's Decision

Shay claims pursuant to *42 U.S.C. § 1983* that Detective Derry violated his *Fourteenth Amendment* rights by filing an allegedly false declaration that caused Shay to be incarcerated for a prolonged period without bail. SAC ¶¶ 36-41. Shay also claims that the County is liable for this violation, pursuant to Monell, because Detective Derry submitted the allegedly false declaration in accordance with a countywide policy. SAC ¶¶ 42-50.

After this Court granted summary judgment to defendants on these claims, the Ninth Circuit reversed and held that "genuine disputes over material facts preclude summary judgment on Shay's [postarrest incarceration] claims concerning the allegedly false declaration Derry submitted in support of the *[§] 1275* hold motion which led to Shay being incarcerated without access to bail." *Shay, 762 F. App'x at 418.* The panel explained:

> In order to hold Shay without bail, Derry submitted a declaration with the 1275 motion providing: "after a review of the facts in this matter, I believe that the defendant has had access to significant amounts of monies feloniously obtained from theft." However, Derry was aware that any allegedly feloniously obtained funds received by Shay were relatively small (around $50,000) **[*7]** [2] and obtained seven years previously. Derry performed no additional investigation into the likelihood that Shay possessed such funds at the present time. Instead, Derry testified that he signed the declaration because it was a countywide "standard practice to request a bail hearing in felony theft cases," regardless of the circumstances. Derry was required under California law to set forth probable cause that the bail money was feloniously obtained. *Cal. Penal Code § 1275.1(b)(1)*. We conclude that under these circumstances, a reasonable jury could find that Derry failed to follow this law and submitted the declaration and deprived Shay of bail with deliberate indifference to or reckless disregard for Shay's rights.

---

[2] Shay's counsel contested the accuracy of this figure at oral argument, contending that the Ninth Circuit erred and should have referred to an amount "around $20,000" instead. The Court notes the disagreement.

*Id.* at 418-19 (internal marks and brackets omitted).

The Ninth Circuit also reversed with respect to Shay's Monell claim against the County. The panel held "that summary judgment is inappropriate" on this claim because of the "factual issues regarding the perquisite constitutional violation" and because "Derry's testimony about the countywide practice generates a genuine dispute of material fact concerning the existence of a long-standing municipal practice that drove the alleged constitutional violations." *Id.* at 419.

After remand, **[*8]** this Court raised the preclusive effect of the Ninth Circuit's decision at the post-appeal status conference. See Sahak Decl., Ex. D at 7-8. Defendants filed the present motion for summary judgment on the two remaining constitutional claims on August 19, 2019.


## III. LEGAL STANDARD

Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*.

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; see also *Fed. R. Civ. P. 56(c)*, *(e)*. Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*; see also *Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997)*.

In light of the evidence presented by the nonmoving party, along with any undisputed **[*9]** facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987)*. When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citation omitted); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997)*. Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. See *Matsushita, 475 U.S. at 587*.


## IV. DISCUSSION

Defendants move for summary judgment on Shay's *§ 1983* postarrest incarceration claim against Detective Derry, as well as his associated Monell claim against the County. See Mot at 5-15. For the reasons discussed below, the Court **DENIES** defendants' motion.


### A. Law Of The Case Precludes Summary Judgment on Shay's Postarrest Incarceration Claims Against Detective Derry And The County

Defendants contend that "Shay cannot raise a triable issue of fact on his remaining constitutional claims," such that defendants "are entitled to judgment as a matter of law." Mot. at 2. The Court disagrees.

As Shay argues in his opposition, defendants' arguments are foreclosed by the law of the case doctrine. See Opp. at 3-4. "The law of the case doctrine states that **[*10]** the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *Herington v. Cty. of Sonoma, 12 F.3d 901, 904 (9th Cir.*

2003). Pursuant to the doctrine, "a court is generally precluded from reconsidering an issue previously decided by . . . a higher court in the identical case." Id. "For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in the previous disposition." Id. "An appellate holding that there remains a disputed issue of fact will preclude a later finding on remand that there is no dispute for summary judgment purposes." *Carson Harbor Vill., Ltd. v. Unocal Corp., No. 96-CV-3281-MMM (RCx), 2003 U.S. Dist. LEXIS 14438, 2003 WL 22038700, at \*2 (C.D. Cal. Aug. 8, 2003)*; see also *Willis v. City of Fresno, No. 09-CV-01766-BAM, 2013 U.S. Dist. LEXIS 131433, 2013 WL 5179515, at \*3 (E.D. Cal. Sept. 13, 2013)* (concluding that "law of the case precludes judgment as a matter of law on remand from an appellate court's reversal of summary judgment if the appellate opinion specifically finds there are disputed issues of material fact that should be resolved by the jury") (internal marks omitted) (citing *Lam v. University of Hawaii, 164 F.3d 1186, 1187-1189 (9th Cir. 1998))*. "Absent the law of the case doctrine, . . . parties could freely relitigate issues that had previously been decided or . . . raise a new argument that could have been, but was not, made earlier." *Alvarado v. Bratton, No. CV 06-7812 PA (RCx), 2009 U.S. Dist. LEXIS 142398, 2009 WL 10712929, at \*2 (C.D. Cal. Feb. 23, 2009)*.

Here, the Ninth Circuit explicitly **[\*11]** concluded that "genuine disputes of material facts preclude summary judgment on Shay's [postarrest incarceration] claims concerning the allegedly false declaration Derry submitted" because "a reasonable jury could find that Derry failed to follow *[§ 1275.1]* and submitted the declaration and deprived Shay of bail with deliberate indifference to or reckless disregard for Shay's rights," and that, in addition, "summary judgment is inappropriate regarding Shay's associated municipal liability claim" since "Derry's testimony generates a genuine dispute of material fact concerning the existence of a long-standing municipal practice that drove the alleged constitutional violations." *Shay, 762 F. App'x at 418-419*.[3]

Applying the law of the case doctrine, the Court concludes that it cannot grant summary judgment to defendants on Shay's postarrest incarceration claims against Detective Derry and the County because the Ninth Circuit, as indicated above, has specifically held that factual disputes preclude granting such relief.[4] See, e.g., *Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454, 459 (9th Cir. 1986)* ("Vucinich II") (holding that where the Ninth Circuit had previously "found in Vucinich I that there were disputed issues of material fact" that defeated summary judgment, "law of the case determined **[\*12]** that this [disputed] evidence should go to the jury," and district court committed error on remand by granting defendant judgment as a matter of law on same facts); *Lam, 164 F.3d at 1187-1189* (holding that the district court committed error by granting judgment as a matter of law following remand from the Ninth Circuit's decision finding issues of fact); see also *Carson Harbor, 2003 U.S. Dist. LEXIS 14438, 2003 WL 22038700 at \*2*; *Willis, 2013 U.S. Dist. LEXIS 131433, 2013 WL 5179515, at \*3*.

## B. The "Substantially Different Evidence" Exception Does Not Apply

Defendants argue that, notwithstanding the foregoing, the Court should reopen the Ninth Circuit's holding because the instant motion "adduces substantially different evidence than what was presented in the first motion for summary judgment." Reply at 7. It is true that law of the case does not necessarily apply where a party submits "substantially different evidence" in a subsequent proceeding. See *Mortimer v. Baca, 594 F.3d 714, 721 (9th Cir.*

---

[3] As the Court discussed at oral argument, that the Ninth Circuit remanded "for further proceedings" rather than "for trial" is not a basis to infer that its order meant to invite the summary judgment motion that defendants have filed. The Ninth Circuit typically only remands "for trial" when an appeal is taken from trial. The appeal in this case was taken from a motion granting summary judgment, and so the panel remanded "for further proceedings." This is unremarkable, and nothing about the Ninth Circuit's remand instruction exempts the instant motion from application of the doctrine of the law of the case.

[4] Defendants' argument that the Ninth Circuit did not decide whether Detective Derry *caused* the constitutional violations in question, raised in their papers and at oral argument, is of no moment. See Mot. at 12-15; Reply at 6. The Ninth Circuit clearly reached the causation issue in its *de novo* review, even if the question was not squarely briefed, holding that there are "genuine disputes over material facts . . . concerning the allegedly false declaration Derry submitted in support of a '1275 hold motion' which *led to* Shay being incarcerated without access to bail." **Shay, 762 F. App'x at 418** (emphasis added). The Ninth Circuit went on to "conclude that under these circumstances, a reasonable jury could find that Derry failed to follow this law and submitted the declaration *and deprived* Shay of bail[.]" **Id. at 419** (emphasis added).

*2010)* (holding that district court was permitted to consider defendant's second motion for summary judgment inter alia because defendant's motion presented considerable new documentary and testimonial evidence).

For example, in *Mortimer*, another § 1983 postarrest incarceration action against the Los Angeles County Sheriff's Department, the Department filed a second **[*13]**  motion for summary judgment in 2007 after remand from a Ninth Circuit decision reversing the district court's first order in 2004. *Id. at 716*. On appeal, the Ninth Circuit affirmed the district court's order granting the second motion over plaintiff's objection that law of the case required the case to go to trial. *Id. at 721*. The second motion, the court found, submitted considerable new evidence involving programs and practices that the Sheriff's Department had implemented during the period preceding the alleged constitutional violations to better manage the detention and release of inmates. *Id. at 718* (explaining that the defendants "presented evidence that the LASD had instituted several measures to reduce the number of over-detentions," including an "In-Court Release" program, a "Greenband" program, an "Over-Detention and Erroneous Release" program, and an "Automated Justice Information System" database). The court further noted that plaintiffs also "offered several items in opposition" not present in the litigation of the initial motion, including testimony from new witnesses, and new supervisor reports. *Id. at 719*.

The facts here are not comparable. The only supposedly new pieces of evidence defendants claim to have **[*14]** adduced are (1) citations to "pretrial procedural protections" that Shay was afforded by California law, and (2) "additional portions" of Detective Derry's deposition transcript, which were available, but not submitted, with defendants' first summary judgment motion.[5] See Reply at 7. Neither is "substantially different evidence" that warrants reopening the Ninth Circuit's holdings.

First, the citations to the California Penal Code's pretrial procedural protections are not evidence. See, e.g., *Landau v. Voss, No. 1:07-CV-00815-AWI, 2010 U.S. Dist. LEXIS 70509, 2010 WL 2791754, at *3 (E.D. Cal. July 14, 2010)* ("[C]itation to . . . statutes is not evidence; it is argument."); *Alleva v. New York City Dep't of Investigation, 696 F. Supp. 2d 273, 278 (E.D.N.Y. 2010)*, aff'd, *413 F. App'x 361 (2d Cir. 2011)* (observing the principle that a "legal argument is not evidence"); cf. *Nash v. Hepp, No. 08-CV-0202-JS, 2010 U.S. Dist. LEXIS 26597, 2010 WL 1221739, at *1 (E.D. Wis. Mar. 22, 2010)*, aff'd, *740 F.3d 1075 (7th Cir. 2014)* (denying motion for reconsideration pursuant to *Rule 60* because legal authority that petitioner "later discovered . . . does not constitute newly-discovered evidence" that warrants reconsideration because a "legal citation is not evidence"). The Ninth Circuit had access to each of the cited statutory provisions when it reviewed the Court's prior MSJ order de novo. See *Shay, 762 Fed. App'x at 417* (citing *San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 601 (9th Cir. 2014))*. Raising them now does not justify an exception to the law of the case doctrine based on substantially **[*15]** different evidence.

Second, unlike in *Mortimer*, where the additional evidence presented new facts regarding the County's policies not previously before the court, the deposition transcript excerpts here—which defendants contend demonstrate that Detective Derry "executed the bail hold declaration because of his personal belief" as opposed to County policy, see Reply at 7—are not substantially or materially different from the evidence that was in the record when the Court considered defendants' first motion for summary judgment.[6] Specifically, Detective Derry's explanation at page

---

[5] Defendants do not specifically identify either the parts of their motion that rely on the procedural protections, nor the relevant portions of the newly attached deposition material. From the Court's own review of the evidence submitted by the parties, it appears that the procedural protections at issue are provisions of the California Penal Code discussed on page seven of defendants' motion. See Mot. at 7. With respect to the deposition testimony, it appears that defendants have attached pages 146-151 from the deposition of Detective Derry, which were not previously submitted in connection with the first summary judgment motion. See Defs.' Compendium of Evidence at 28-33 ("Defs.' Evid."), ECF No. 84-2.

[6] Defendants neither identify the relevant passages from the proffered material that the Court has located (see also supra n.5), nor explain why the evidence in those unidentified passages is substantially different from the previous record—they just conclusively assert that it is. See Reply at 7-8. The Court may decline to find an exception to the law of the case doctrine on that basis alone. See *Syufy Enterprises v. Am. Multi-Cinema, Inc., 694 F. Supp. 725, 728 (N.D. Cal. 1988)* (applying law of the case over an objection that substantially different evidence precluded its application where the party invoking the exception only

145:7-25 of his deposition that he submitted the bail hold declaration in part because he "believed that" Shay had access to "$51,829 [that] was feloniously obtained as the proceeds of [an allegedly] illicit loan" was submitted and considered with the first summary judgment motion, and presented to the Ninth Circuit on appeal. See Decl. of John Burton, Ex. S at 145, ECF No. 62 (first motion); see also Defs.' Evid., Ex. E at 145 (also cited in support of the present motion). The subsequent five pages of deposition testimony from Detective Derry submitted with this motion adds nothing of substance to the facts **[*16]**  set forth in that original colloquy, which the Ninth Circuit found sufficient to raise triable issues in combination with other portions of his testimony. Cf. Defs.' Evid., Ex. E at 146-151. This was not the case in Mortimer, where the evidence of the County's various programmatic interventions during the relevant period had not previously been raised. Law of the case should not be disturbed in this setting. See *Los Angeles Police Protective League v. City of Los Angeles, No. 08-CV-0784 GAF (RCx), 2010 U.S. Dist. LEXIS 154769, 2010 WL 11622793, at *7 (C.D. Cal. Feb. 3, 2010)* (concluding that testimony "does not constitute substantially new evidence" that warrants exception to law of the case when "similar evidence . . . was previously before the Court") (internal quotation marks omitted).

At bottom, the additional materials cited do not contain new evidence, as the evidence of the programs and practices did in *Mortimer,* but an attempt to relitigate an argument that the Ninth Circuit already rejected. That is not a basis to find an exception to the rule that the Ninth Circuit's decision in *Shay* is binding law of the case. See *Campbell v. United States*, 878 F.2d 385 (9th Cir. 1989) (holding that there was no "substantially different evidence" that warranted application of exception to law of the case doctrine where **[*17]**  the government's purportedly new evidence advanced an argument that was "equally available to the government at the time of our prior appeal").

For the foregoing reasons, the Court concludes that the law of the case precludes summary judgment on Shay's postarrest incarceration claims against Detective Derry and the County.

### C. Genuine Disputes of Material Facts Prevent The Court From Determining Whether Detective Derry Is Entitled to Qualified Immunity

Detective Derry also moves for summary judgment on grounds that he is entitled to qualified immunity. See Mot. at 16-18.

"Qualified immunity protects officers from liability for civil damages where their alleged unconstitutional conduct does not violate a clearly established right." *Ford v. City of Yakima, 706 F.3d 1188, 1192 (9th Cir. 2013)*. Generally, courts follow a two-step inquiry in determining whether a government official is entitled to qualified immunity. *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right." *Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. Second, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. Pursuant to the Supreme Court's two-step inquiry, "the **[*18]**  relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier, 533 U.S. at 202*. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id. at 201*. A "case directly on point" is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*.

Applying this two-step analysis, the Court finds and concludes as follows.

### 1. Law Of The Case Precludes Summary Judgment On The Existence Of A Constitutional Violation

---

offered "conclusory, and unsubstantiated references to new evidence," and did "not show how this exception would apply in this case").

As discussed in § IV.A, supra, it is law of the case that genuine disputes of material fact preclude summary judgment on Shay's postarrest incarceration claim against Detective Derry. See *Shay, 762 F. App'x at 419* (holding that "a reasonable jury could find that Derry failed to follow th[e] law and submitted the declaration and deprived Shay of bail with deliberate indifference to or reckless disregard for Shay's rights"). After these factual disputes are resolved, it may be determined that Detective Derry's conduct was lawful, or it might not be. But, pursuant to the Ninth Circuit's holding, **[*19]** the Court cannot make that determination now. See *Wilkins v. City of Oakland, 350 F.3d 949, 956 (9th Cir. 2003)* ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); see also *Chien Van Bui v. City & Cnty. of San Francisco, 61 F. Supp. 3d 877, 898-99 (N.D. Cal. 2014)* ("This is not to say that the officers may not be entitled to qualified immunity after the disputed material facts are resolved. But for now, the court denies Defendants' motion insofar as it asks the court conclude that the officers are entitled to qualified immunity.").

The Court accordingly finds that there are genuine disputes of material facts as to whether Detective Derry's conduct violated Shay's *Fourteenth Amendment* rights, which preclude summary judgment on the first step of the qualified immunity test.

**2. Genuine Disputes Of Material Facts Prevent The Court From Determining Whether The Specific *Fourteenth Amendment* Rights Violated, If Any, Were Clearly Established At The Time**

Even if Detective Derry is found to have violated Shay's *Fourteenth Amendment* rights, he may still be entitled to qualified immunity pursuant to the second step of the analysis if the constitutional violation he caused was not "clearly established" at the time he executed the bail hold. *Wilkins, 350 F.3d at 955* ("Even if [defendant's] **[*20]** actions did violate the *Fourth Amendment*, a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity.").

But given the genuine disputes of material facts outlined in § IV.C.1, supra, the Court is precluded from making this determination. Until the genuine disputes of material facts in this case are resolved, the Court cannot determine what constitutional violation occurred, and, consequently, whether that constitutional violation, if any, was "clearly established" at the relevant time such that Detective Derry could reasonably believe his conduct was lawful. See *Espinosa v. City & Cnty. of S.F., 598 F.3d 528, 532 (9th Cir. 2010)* (affirming a denial of summary judgment on qualified immunity grounds because "there are genuine issues of fact regarding whether the officers violated [the plaintiff's] [constitutional] rights" that were "also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions"); *Santos, 287 F.3d at 855 n.12* (declining to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); see also *Curiel v. Cty. of Contra Costa, 362 F. App'x 824, 830 (9th Cir. 2010)* ("[B]ecause the deputies **[*21]** dispute Appellants' version of what happened . . . and resolution of those facts are material to a proper determination of the reasonableness of the deputies' belief in the legality of their actions, we leave the determination of qualified immunity to the district court on remand.").[7]

Because there are genuine disputes of material facts that preclude the Court from determining at this time whether Detective Derry could reasonably believe his conduct was lawful or in violation of clearly established law, the Court concludes that it should deny defendants' summary judgment **[*22]** motion with respect to the second step of the qualified immunity analysis, as well.

---

[7] Defense counsel's contentions at oral argument do not change the Court's conclusion. As discussed above, courts routinely deny summary judgment to defendants at step two of the qualified immunity analysis where disputed facts at step one preclude a determination of the specific constitutional violation in question. Contrary to defense counsel's arguments, there has been no determination as to what, if any, specific constitutional violation Detective Derry committed. Until the still-disputed facts underlying that possible violation are settled at trial, the Court cannot determine at this time "whether it would be clear to" Detective Derry "that his conduct was unlawful in the situation he confronted." *Saucier, 533 U.S. at 202*.

**V. CONCLUSION**

In accordance with the foregoing, the Court **DENIES** defendants' motion for summary judgment.

IT IS SO ORDERED.

---

**End of Document**

 Neutral

As of: March 31, 2026 8:16 PM Z

# *Willis v. City of Fresno*

United States District Court for the Eastern District of California

September 13, 2013, Decided; September 13, 2013, Filed

Case No. 1:09-cv-01766-BAM

**Reporter**

2013 U.S. Dist. LEXIS 131433 *; 2013 LX 72659; 2013 WL 5179515

CHRIS WILLIS, et al., Plaintiffs, vs. CITY OF FRESNO, et al., Defendants.

**Subsequent History:** Motions ruled upon by *Willis v. City of Fresno, 2013 U.S. Dist. LEXIS 166722 (E.D. Cal., Nov. 21, 2013)*

**Prior History:** *Willis v. City of Fresno, 2011 U.S. Dist. LEXIS 76982 (E.D. Cal., July 12, 2011)*

## Core Terms

reconsider, summary judgment, gun, disputed issue, summary judgment motion, oral argument, petition for rehearing, law of the case, manifest, trunk, reconsideration motion, clearly erroneous, excessive force, district court, material fact, clear error, bind

**Counsel:** [*1] For Chris Willis, individually and successors in interest to Stephen Willis, Mary Willis, individually and successors in interest to Stephen Willis, Stephen Willis, Plaintiffs: Peter J Koenig, LEAD ATTORNEY, Walker, Hamilton & Koenig, San Francisco, CA; Walter Walker, LEAD ATTORNEY, Clarissa Elaine Kearns, Walker, Hamilton & Koenig LLP, San Francisco, CA.

For Jennifer Uribe, Plaintiff: Peter J Koenig, LEAD ATTORNEY, Walker, Hamilton & Koenig, San Francisco, CA; Walter Walker, LEAD ATTORNEY, Walker, Hamilton & Koenig LLP, San Francisco, CA.

For City Of Fresno, Officer Greg Catton, Officer Daniel Astacio, Chief Jerry Dyer, Defendants: James D. Weakley, LEAD ATTORNEY, Brande Lynn Gustafson, Roy C. Santos, Weakley & Arendt, LLP, Fresno, CA; Tamara Bogosian, LEAD ATTORNEY, Fresno City Attorney's Office, Fresno, CA.

**Judges:** Barbara A. McAuliffe, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Barbara A. McAuliffe

## Opinion

### ORDER DENYING MOTION FOR RECONSIDERATION

On August 23, 2013, Defendants City of Fresno, Officer Greg Catton and Officer Daniel Astacio (collectively "defendants") filed a motion for reconsideration of defendants' motion for summary judgment or in the alternative relief from the order of the Court. (Doc. 173.)  [*2] Defendants seek reconsideration of the Court's July 13, 2011 Order Granting Defendants' Motion for Summary Judgment. Specifically, Defendants argue that when the July 13 Order was appealed to the Ninth Circuit, Plaintiffs' counsel made certain concessions concerning Defendants' liability which justify reconsideration of the July 13 Order. Plaintiffs filed an opposition on August 30, 2013. The Court found the motion suitable for decision without oral argument. (*L.R. 230(g)*.)

Nicole Sullivan

**Brief Overview of the Facts**

The facts of this case warrant the briefest of overview in light of the issues presented in this motion. Decedent Stephen Willis ("Stephen") was shot by defendant Officers Catton and Astacio, while he was in a parking lot in front of his home in the Stoneybrook Apartment complex at Winery and Balch in Fresno. During the early morning of March 28, 2009, Stephen, a 23-year-old trade school student, was fatally shot after defendant Officers Catton and Astacio encountered Stephen. It is undisputed that Stephen possessed a .38 caliber revolver ("revolver") which he was retrieving from the trunk of his car. Officers Catton and Astacio, unbeknownst to Stephen, had pursued Stephen who had parked **[*3]** his vehicle in front of his Fresno apartment. Stephen got out of his car, walked to the vehicle's trunk "so that he could remove his belongings, including a firearm that was enclosed in a case and that he had used at a firing range earlier in the day." Plaintiffs contend that without warning or identifying themselves, Officers Catton and Astacio shot until Stephen fell or dove to the ground and continued shooting "until they had put 14 bullets into him, including several in his back, out of at least 35 bullets fired at him, and he was dead."

**Procedural Overview**

This action was filed on October 7, 2009. Plaintiffs Chris Willis and Mary Willis are Stephen's natural parents. They claimed wrongful death and excessive force claims against the City and Officers Canton and Astacio. [1] On July 13, 2011, District Judge Lawrence O'Neill granted the defendants' motion for summary judgment on all claims and entered judgment against plaintiffs. Plaintiffs filed a notice of appeal on August 9, 2011. Following briefing and oral argument, the Ninth Circuit affirmed the summary judgment in part and reversed in part on May 30, 2013. Pursuant to the Ninth Circuit's unpublished memorandum decision only the **[*4]** following claims remain:

1. Violation of the *Fourth Amendment* pursuant to *section 1983* based on the alleged use of excessive force by Officers Catton and Astacio arising out of the entire subject incident;

2. Violation of the *Fourteenth Amendment* pursuant to *section 1983* based on the alleged denial of familial relationship by Officers Catton and Astacio arising only out of their initial firing upon the decedent Stephen Willis; and

3. State law wrongful death-negligence based on the alleged use of excessive force by Officers Catton and Astacio during the subject incident. The only claim of liability remaining against the City of Fresno is based on vicarious liability arising out of Plaintiffs' state law claim for wrongful death-negligence. All other claims have been dismissed.

**The Basis for this Motion**

Following the mandate from the Ninth Circuit, the parties consented to the jurisdiction of the Magistrate Judge, and this case was assigned to Magistrate Judge Barbara A. McAuliffe. Defendants then requested leave to file a motion for reconsideration to seek reconsideration of the Court's July 13, 2011 Order Granting Defendants' **[*5]** Motion for Summary Judgment.

Defendants contend that plaintiffs' counsel, while seeking to provide the Ninth Circuit panel with detailed facts regarding the initial moments of the shooting, made binding concessions concerning defendants' liability. Specifically, defendants argue Plaintiffs' counsel conceded that Stephen reached for and grabbed his visible handgun in response to seeing Officer Catton's flashlight. Defendants contend this binding concession by Plaintiffs' counsel during oral argument constitutes new evidence which was not previously before this Court when it issued

---

[1] Other parties and claims have been dismissed from this case.

its order on Defendants' motion for summary judgment. Defendants request that the Court reconsider the motion and grant summary judgment.

**The Mandate by the Ninth Circuit**

Defendants base their request on grounds that the Ninth Circuit's decision is clearly erroneous, and as such, it is not binding on this Court or any other appellate court. (Doc. 173, p. 8.) Defendants argue that there is an exception to "law of the case" where "the decision is clearly erroneous and its enforcement would work a manifest injustice." Defendants cite, among other cases, *Mortimer v. Baca, 594 F.3d 714, 720-721 (9th Cir. 2010)* (district **[*6]** court was free to consider issue alluded to but not decided in prior court of appeals decision). As stated in their moving papers, "Defendants bring their motion on the highly unusual grounds that the Ninth Circuit's memorandum decision constitutes a clear error of law which renders it non-binding on this Court; and that denial of reconsideration and summary judgment will cause a manifestly unjust result." (Doc. 173, p.2:2-5.)

In the present case, however, defendants do not address the specific mandate by the Court of Appeals to this Court. The Ninth Circuit found that disputed issues of fact exist as to the claim for *Fourth Amendment* excessive force, the claim for *Fourteenth Amendment* "shock the conscience," and the state law wrongful death claim. As to the excessive force claim, the Ninth Circuit's decision pinpointed the key disputed issues of fact during the moments of the incident, finding disputed facts regarding at what point Stephen drew the gun and what the officers saw. The Court held that, "[t]he district court erred in granting summary judgment to Catton and Astacio on the Willis' *Fourth Amendment* claim." (Doc. 155, p. 2-3.) As to the shock the conscience claim, the Court **[*7]** held: "The district court erred in concluding that no rational juror could find that Catton or Astacio's initial firing, before Willis began to move or attempted to draw his gun, shocked the conscience." (Doc. 155 p.4.) Based upon the finding of disputed issues of material fact, the Ninth Circuit "AFFIRMED IN PART AND REVERSED IN PART." (Doc. 155, p.6.) Then, after denying defendants' petition for rehearing, the Court issued its mandate: "This constitutes the formal mandate of this Court issued pursuant to *Rule 41(a) of the Federal Rules of Appellate Procedure*." [2] (Doc. 160.) Thus, pursuant to the terms of the mandate, the Ninth Circuit's finding of factual disputes is the mandate to this Court.

Lower courts are bound to execute the terms of the Ninth Circuit's mandate. In other words, the district court must follow the appellate ruling. *U.S. v. Carpenter, 526 F.3d 1237, 1240 (9th Cir. 2008)*. The rule of mandate is jurisdictional. *United States v. Thrasher, 483 F.3d 977, 982 (9th Cir. 2007)*, *cert. denied, 553 U.S. 1007, 128 S. Ct. 2052, 170 L. Ed. 2d 798 (2008)*. **[*8]** While there is some flexibility in following the mandate (*United States v. Kellington, 217 F.3d 1084, 1095, fn. 12 (9th Cir. 2000))*, that flexibility does not include acting contrary to terms expressly mandated by the Ninth Circuit's decision.

This Court finds that to grant defendants' motion would be contrary to the express mandate by the Ninth Circuit to this Court. The Ninth Circuit reversed the grant of summary judgment based upon specific findings of material issues of fact for trial on the precise issue for which defendants seek reconsideration. Defendants, in sum, request that this Court reverse the holding of the Ninth Circuit. This Court, as the parties are well aware, does not sit in appellate review of the Ninth Circuit's decision. *United States v. Thrasher, 483 F.3d at 982* (rule of mandate served the interest in preserving the hierarchical structure of the court system).

Defendants argue this Court should not be bound by "law of the case." Defendants argue that an exception to law of the case is present here because the decision of the Ninth Circuit is clearly erroneous since it failed to apply binding precedent and is factually erroneous.

To the contrary, "law of the case," **[*9]** precludes judgment as a matter of law on remand from an appellate court's reversal of summary judgment if the appellate opinion specifically finds there are disputed issues of material fact that should be resolved by the jury. *Lam v. University of Hawaii, 164 F.3d 1186, 1187-1189 (9th Cir. 1998)* (in a

---

[2] *Rule 41(a)* states in pertinent part: "[T]he mandate consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any direction about costs."

second appeal, after remand on the first appeal, the Ninth Circuit found the district court erroneously excluded testimony which the prior appellate opinion addressed as raising issues of fact); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454, 459 (9th Cir. 1986)* (after remand on reversal of a summary judgment, the trial court granted a directed verdict. In the second appeal, the court held the law of the case required the case to proceed to trial).

Here, the Ninth Circuit expressly reversed summary judgment on the finding that disputed issues of fact exist for trial. This Court's duty is to execute the mandate. [3]


## Ambiguous  [*10] Statement

Even if this Court were to consider the statement plaintiffs' counsel made at oral argument to the Ninth Circuit, this Court would not grant reconsideration.

A court may properly exercise its discretion to reconsider a previously-decided issue where:

  • the decision is clearly erroneous and its enforcement would work a manifest injustice;

  • intervening controlling authority makes reconsideration appropriate; or

  • substantially different evidence was adduced at a subsequent trial.

*United States v. Jingles, 702 F.3d 494, 502 (9th Cir. 2012)*, cert. denied, 133 S. Ct. 1650, 185 L. Ed. 2d 630 (2013); *See also, Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir. 2009)* ("A motion for reconsideration should not be granted, absent highly unusual circumstances, unless the ... court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law") (internal quotations marks and citations omitted). Reconsideration is not a mechanism for the parties "to ask the court to rethink what the court has already thought through—rightly or wrongly." *United States v. Rezzonico, 32 F.Supp.2d 1112, 1116 (D. Ariz.1998)*. "Clear error  **[*11]** presupposes a manifest failure to consider material facts presented to the court before the decision." *Yeager v. AT&T Mobility, LLC, 2011 U.S. Dist. LEXIS 96952, 2011 WL 3847178 (E.D. Cal. 2011)*. "A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the arguments considered by the court before rendering its original decision fails to carry the moving party's burden." *United States v. Westlands Water Dist.,134 F.Supp.2d 1111, 1131 (E.D. Cal. 2001)* (internal citations omitted). "To succeed, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *U.S. v. Westlands Water, 134 F.Supp.2d 1111, 1131 (E.D. Cal. 2001)*.

Defendants argue that plaintiffs' counsel made the statement during oral argument which admitted that Stephen had the gun out, or exposed to view, which therefore, provided justification for Stephen being shot. Defendants argue this admission is binding, and summary judgment should be reconsidered.

The statement by plaintiffs' counsel during rebuttal oral argument is as follows:

If - - if Officer Catton puts the flashlight on Mr. Willis, he doesn't know who they are. He turns, **he's [*12] already got the gun out,** he didn't mean to draw the gun on anyone, but he turns and he has the gun." Transcript p. 35 (emphasis added).

The Court does not view the isolated statement by counsel as the "clear cut" admission as argued by defendants in their motion. In reviewing the transcript, plaintiffs' counsel was making an argument during rebuttal and made the

---

[3] A party who believes the district court has misconstrued or failed to execute the mandate is not without a remedy. The party may either apply for a writ of mandamus or upon a new appeal, ask the appellate court to construe its mandate and act accordingly. *See U.S. v. Kellington, 217 F.3d 1084 1095 n. 12*.

statement in response to a defense counsel's arguments. Plaintiffs' argument is that, consistent with the evidence, the statement means Stephen had his gun "out of the trunk" of the car; counsel did not argue the Stephen had unholstered his gun, wholly or partially, when he turned from the trunk.

Reading the transcript in light of the argument and the evidence presented in the summary judgment motion, plaintiffs have proffered a reasonable interpretation and meaning of the statement "he's already got the gun out." Indeed, this statement does not admit Stephen had his gun **unholstered**. At a minimum, the statement is ambiguous as to its meaning. All reasonable inferences must be drawn in the opposing party's favor both where the underlying facts are undisputed (e.g., background or contextual matters) and where they are in controversy. **[\*13]** *Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 112 S.Ct. 2072, 119 L. Ed. 2d 265 (1992)*; *McSherry v. City of Long Beach, 584 F.3d 1129, 1135 (9th Cir. 2009)* (At the summary judgment stage, the nonmovant's version of any disputed issue of fact is presumed correct), *cert. denied, 131 S. Ct. 79, 178 L. Ed. 2d 26 (2010)*.

The Court finds that even if it disregarded proper judicial hierarchy and reviewed the Ninth Circuit's decision, this Court would not exercise discretion to reconsider the motion for summary judgment based upon counsel's "admission." The statement is not clear and unambiguous. The "admission" by counsel does not state with clarity that Stephen in any way unholstered the gun when he turned from the trunk of the car. Stephen's movements and what the officers saw when he turned from the trunk was the subject of substantial briefing, argument and petitions for rehearing at the Ninth Circuit. The Ninth Circuit held that disputed issues of fact existed. Counsel's statement does not raise legitimate grounds to reconsider the summary judgment motion.

Further, the Court notes that defendants raised this precise issue with the Ninth Circuit in their petition for rehearing. In June 2013, defendants **[\*14]** filed the petition for rehearing. The petition argued that "Appellants' counsel, at oral argument, conceded that Stephen was not merely standing still, but rather he reached for and grabbed his handgun prior to the Officers firing at him contrary to the panel's speculation otherwise." (Petition for Rehearing, p.12.) Defendants argued that summary judgment on the *Fourth* and *Fourteenth Amendments* was correctly granted even assuming plaintiffs' version of the facts. While defendants did not seek an "admission" of facts in the petition for rehearing, defendants nonetheless raised the issue for the Ninth Circuit's consideration. It is not for this Court to second-guess the Ninth Circuit's express mandate.

**Order**

For the foregoing reasons, the Motion for Reconsideration is DENIED. The Court will issue a Final Pretrial Order once the parties have submitted their joint statement as required by the Pretrial Order. (Doc. 172).

IT IS SO ORDERED.

Dated: **September 13, 2013**

**/s/** Barbara A. McAuliffe

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10345 Olympic Boulevard, Los Angeles, California 90064.

A true and correct copy of the foregoing documents entitled (*specify*): **NOTICE OF UNPUBLISHED AUTHORITIES CITED IN MULTIPLE ENERGY TECHNOLOGIES, LLC'S RESPONSE TO DEBTOR'S BRIEF IN SUPPORT OF SUMMARY JUDGMENT AFTER REMAND FROM THE DISTRICT COURT** will be served or were served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 31, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Todd M Arnold    tma@lnbyg.com**
- **Ron Bender    rb@lnbyg.com**
- **Thomas E Butler    butlert@whiteandwilliams.com, sullivann@whiteandwilliams.com;millnamowm@whiteandwilliams.com;panchavatis@whiteandwilliams.com**
- **Robert Carrasco    rmc@lnbyg.com, rmc@lnbyg.com**
- **Oscar Estrada    oestrada@ttc.lacounty.gov**
- **Theodore W Frank    frank@psmlawyers.com, knarfdet@gmail.com;navarro@parkermillsllp.com**
- **John-Patrick M Fritz    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com**
- **Michael S Greger    mgreger@allenmatkins.com, kpreston@allenmatkins.com**
- **Brian T Harvey    bharvey@buchalter.com, docket@buchalter.com;dbodkin@buchalter.com;pjolley@buchalter.com**
- **Gregory Kent Jones (TR)    gjones@sycr.com, smjohnson@sycr.com;C191@ecfcbis.com;cpesis@stradlinglaw.com**
- **Raffi Khatchadourian    raffi@hemar-rousso.com**
- **Tinho Mang    tmang@marshackhays.com, tmang@ecf.courtdrive.com;alinares@ecf.courtdrive.com;cmendoza@ecf.courtdrive.com;cmendoza@marshackhays.com**
- **Ron Maroko    ron.maroko@usdoj.gov**
- **Juliet Y. Oh    jyo@lnbyg.com, jyo@lnbyb.com**
- **Carmela Pagay    ctp@lnbyg.com**
- **Yvonne Ramirez-Browning    yvonne@browninglawgroup.com, veronica@browninglawgroup.com**
- **Kurt Ramlo    RamloLegal@gmail.com, kr@ecf.courtdrive.com,ramlo@recap.email**
- **Gregory M Salvato    gsalvato@salvatoboufadel.com, calendar@salvatolawoffices.com;jboufadel@salvatoboufadel.com;gsalvato@ecf.inforuptcy.com**
- **James R Selth    jselth@yahoo.com, jselth@yahoo.com,maraki@wztslaw.com,sfritz@wztslaw.com,admin@wztslaw.com**
- **Zev Shechtman    Zev.Shechtman@saul.com, zshechtman@ecf.inforuptcy.com;hannah.richmond@saul.com;LitigationDocketing@saul.com;Shelly.Guise@saul.com;Isaiah.Bribiesca@saul.com**
- **Lindsey L Smith    lls@lnbyb.com, lls@ecf.inforuptcy.com**
- **Randye B Soref    rsoref@polsinelli.com, ccripe@polsinelli.com;ladocketing@polsinelli.com**

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

- **Heidi J Sorvino    sorvinoh@whiteandwilliams.com,
  millnamowm@whiteandwilliams.com;sullivann@whiteandwilliams.com;panchavatis@whiteandw
  illiams.com;butlert@whiteandwilliams.com**
- **Alan Stomel    alan.stomel@gmail.com, astomel@yahoo.com**
- **Annie Y Stoops    annie.stoops@afslaw.com, yvonne.li@afslaw.com**
- **Nicole Sullivan    sullivann@whiteandwilliams.com,
  vulpioa@whiteandwilliams.com,arthura@whiteandwilliams.com**
- **Derrick Talerico    dtalerico@wztslaw.com,
  maraki@wztlfirm.com,sfritz@wztlfirm.com,admin@wztlfirm.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Larry D Webb    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com**
- **David Wood    dwood@marshackhays.com,
  dwood@ecf.courtdrive.com;lbuchananmh@ecf.courtdrive.com;spineda@ecf.courtdrive.com;alina
  res@ecf.courtdrive.com**
- **Roye Zur    rzur@elkinskalt.com,
  lwageman@elkinskalt.com;1648609420@filings.docketbird.com;rzur@ecf.courtdrive.com;lmasse
  @elkinskalt.com**

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **March 31, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660 / Courtroom 1668
Los Angeles, CA 90012

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **March 31, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 31, 2026 | Lisa Masse | /s/ Lisa Masse |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**